[No. D035245. Fourth Dist., Div. One. Oct. 31, 2000.]

STONY BROOK I HOMEOWNERS ASS'N et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
ROBERT DIEHL, Real Party in Interest.

**COUNSEL**

Gregory H. Schwab, in pro. per.; Bremer & Whyte, Nicole Whyte, Tyler D. Offenhauser and Everett Skillman for Petitioners.

No appearance for Respondent.

Schoville & Arnell and Louis G. Arnell for Real Party in Interest.

## Opinion

**BENKE, J.**—The petitioners in this extraordinary proceeding are an orthopedic specialist and a homeowners association which retained the specialist to evaluate plaintiffs' alleged injuries. In a number of prior proceedings in which he had testified as an expert, the specialist had been unwilling to provide any estimate of the percentage of his forensic cases in which he was retained by defendants and the percentage of forensic cases in which he was retained by plaintiffs. Prior to his deposition the trial court ordered that the specialist produce a summary showing his total compensation for defense work and total compensation for plaintiffs work over the last four years. Because the specialist found that producing such a summary would consume over 90 hours of labor from his staff and significantly disrupt his practice, the trial court further ordered that the specialist provide access to his patient files to temporary personnel who would compile the information needed for the summary.

We grant the specialist's and homeowners association's petition for relief from the trial court's orders. Although an expert must provide such information about his role in prior proceedings as will permit an adversary a meaningful opportunity to demonstrate any bias or prejudice, precise information about the number of cases in which the expert has testified or the amount of compensation the expert has received is not required.

### Summary

In his complaint, real party in interest Robert Diehl alleged that he fell when a stairway railing on premises controlled by petitioner Stony Brook I Homeowners Ass'n (Stony Brook) gave way.

Stony Brook answered the complaint and designated petitioner Gregory H. Schwab, M.D., as its medical expert. Schwab examined Diehl and prepared a report for Stony Brook. On January 12, 2000, Diehl served Schwab with a subpoena duces tecum which required that he produce at his deposition all his "defense litigation-related billings to insurance companies from 1-1-96 to present" and all his "plaintiff litigation-related billings from 1-1-96 to present."

Stony Brook then moved to quash the subpoena or in the alternative for a protective order limiting the scope of records and testimony Schwab would be required to produce at his deposition. Stony Brook argued the request for billing records was overly broad, burdensome and an invasion of both Schwab's and his patients' privacy rights.

In response to the motion to quash, Diehl produced excerpts of deposition and trial testimony Schwab had given in six separate personal injury cases. The excerpts show that when asked to provide estimates of what portion of his practice is devoted to providing expert testimony or the percentage of cases in which he was retained by defendants as opposed to cases in which he was retained by plaintiffs, Schwab, was, to put it generously, less than forthcoming. We set forth the following excerpts as indicative of the nature of Schwab's responses. In the first excerpt counsel is attempting to determine how much of Schwab's practice is devoted to expert testimony.

"Q. And approximately how many of those physical exams do you do per week?

"A. It's going to vary. What physical exam? You mean medical/legal exam?

"Q. Yes.

"A. I don't know. It's varied.

"Q. Do you do more than two a week?

"A. I may.

"Q. On average I'm just asking?

"A. I don't have an average. I don't know.

"Q. How about a monthly average? Do you do at least ten a month?

"A. I don't know.

"Q. How about May 1995? Do you know if you did more than five this past month? Medical/legal exams.

"A. I don't know how many I did.

"Q. Okay. My question is—let's just assume that you've done at least one, correct?

"A. Right.

"Q. Have you done 20?

"A. Do you wish me to guess?

"Q. I'd like to have an estimate.

"A. I don't have one.

"Q. How could you find out if you needed to find that out?

"A. Well, I guess I'd have to go back through the computer and see what I could dig up.

"Q. How many medical/legal exams have you done in the last year?

"A. I don't know.

"Q. More than ten?

"A. Do you wish me to guess?

"Q. If you have an estimate, I'd like to know.

"A. I don't have one.

"Q. You have no knowledge as to whether you've done more than ten medical/legal exams in the last year?

"A. You can throw up any number you want. I don't have any idea of how many I did.

"Q. But you do know that you've done at least more than one, correct? [¶] . . . [¶]

"A. In the last year.

"Q. Yeah.

"A. Yes.

"Q. And is it fair to say that you've done more than five in the last year, medical/legal exams?

"A. I don't—I really don't have an estimate for you."

In this second excerpt counsel was attempting to determine what portion of Scwab's work as an expert is for defendants and what portion is for plaintiffs.

"Q. You've been asked to perform an independent medical evaluation on a plaintiff?

"A. Yes.

"Q. How often does that happen?

"A. I don't know. [¶] . . . [¶]

"A. . . . Have I been asked to do evaluations for plaintiff's attorneys, yes.

"Q. And have you done them?

"A. Yes.

"Q. Okay. More than 10 percent of the forensic work that you do?

"A. I can't give you any specific numbers. Again, I can tell you the majority is for the defense but certainly not exclusively by any means.

"Q. Well, majority is 51 percent, or its more like 75 percent 80 or 90 percent?

"A. My use and understanding of the term 'majority' is something in excess of 50 percent.

"Q. And you can't do any further between 50 and 100 percent, right?

"A. Right.

"Q. Have you been asked that question before, doctor?

"A. Yes.

"Q. Did you ever think it might be helpful to take a look at that information so that you could answer the question?

"A. Well, the only way I know to do that is to go through each and every chart. I've got several rooms full of file cabinets full of charts. And I didn't choose to spend my time in that fashion.

"Q. Do you keep your litigation charts with your patient charts?

"A. Yes.

"Q. Mixed in?

"A. Yes.

"Q. Ever think of keeping them separate so you could start to keep track so you could give this information to people who were interested in these questions that you've been asked before?

"A. I'm not going to discuss my office procedures today. That's the way we do it for any number of reasons."

Stony Brook did not attempt to defend the propriety of Schwab's deposition. Rather, Stony Brook responded to the excerpts by arguing: "In support of plaintiff's opposition, Dr. Schwab's previous deposition transcripts are offered as evidence to show that Dr. Schwab will not respond to direct questions about percentages of time he worked for the defendant as opposed to plaintiff. Additionally, plaintiff asserts that Dr. Schwab has an uncooperative memory. This is absurd. Dr. Schwab's deposition has not even been taken. Dr. Schwab has not been uncooperative in this matter at all. Simply stated, plaintiff's deposition subpoena is premature and lacks foundation."

As we noted at the outset, on March 9, 2000, the trial court denied Stony Brook's motion to quash the subpoena and instead issued an order requiring that Dr. Schwab respond to it by producing a summary setting forth the total number of patients he has treated over the last four years, the total number of patients he has examined for defendants, the total number of patients he has examined for plaintiffs, his total compensation from defendants and his total compensation for plaintiffs. The court found Diehl's need for the information outweighed any burden it would impose on Schwab and that Schwab had shown a "past inability to provide the information at oral deposition."

On March 10, 2000, following issuance of the trial court's order, Stony Brook applied ex parte for relief from the order on the grounds that the 90 hours it would take to compile the information needed for the summary was unduly burdensome. In response to the ex parte application the trial court ordered Schwab to give temporary personnel retained by Diehl access to his patient files for the purpose of compiling the summary.

Stony Brook and Schwab filed a timely petition for a writ of mandate in which they assert the trial court's orders unduly invade Schwab's right of

privacy and further that, if the orders are enforced, they will prevent Stony Brook from obtaining expert testimony from Schwab. Appended to the petition is a declaration which in pertinent part states: "Dr. Schwab is willing to provide a percentage reflecting his total 'plaintiff' versus 'defense' forensic cases, and the percentage income derived from 'plaintiff' versus 'defense' forensic work, without divulging the exact dollar amounts. Dr. Schwab's deposition has not been taken in the present case, and he is willing to provide the information set forth in this paragraph at his deposition." The declaration further states that if Schwab is compelled to comply with the trial court's March 9, 2000, order, he will withdraw as Stony Brook's medical expert.

We granted Schwab and Stony Brook's application for a stay of the trial court's orders and issued an order to show cause.

## DISCUSSION

### I

■ We begin our analysis of the petition by recognizing what Stony Brook and Schwab have obliquely conceded here and in the trial court. Schwab's prior responses to efforts to determine how much of his practice is devoted to providing expert testimony for defendants in personal injury actions were inadequate. One can see this concession both in Stony Brook's failure to defend in the trial court the propriety of Schwab's responses and in Schwab's own declaration in this court that he is now willing to provide percentage estimates of his defense and plaintiff's work.

Thus there is no serious dispute here that Diehl is entitled to know "what percentage of [Schwab's] practice involves examining patients for the defense and how much compensation he derives from defense work." (*Allen v. Superior Court* (1984) 151 Cal.App.3d 447, 453 [198 Cal.Rptr. 737].) Indeed, the Law Revision Commission comment to Evidence Code section 722, which permits discovery of how much compensation an expert receives in a particular case, notes "[t]he tendency of some experts to become advocates for the party employing them." (Cal. Law Revision Com. com., 29B pt. 2 West's Ann. Evid. Code (1995 ed.) foll. § 722, p. 357.) "Just as payment in [a particular case] is some evidence of advocacy, so too would be evidence that the particular expert usually or always testifies for one side of a particular class of lawsuit." (*Allen v. Superior Court, supra*, 151 Cal.App.3d at p. 451.)

There also can be no serious dispute that in his prior testimony, Schwab effectively prevented plaintiffs from obtaining evidence of his potential bias by repeatedly stating that he could not make an estimate of how much work he did for defendants and that his filing system and office procedures made it impractical to obtain such information. Thus, neither Stony Brook nor Schwab can dispute the trial court's finding that Schwab "demonstrated a past inability" to provide information about the nature of his practice.

## II

In the face of an expert who is unable to provide a good faith estimate of how much of his practice is devoted to offering testimony for one side or the other in litigation and how much he has received for such work, the trial court faces a difficult task.

First, a litigant's right to evidence of an expert's potential bias is not unfettered or unconditional. As here, in *Allen v. Superior Court, supra,* 151 Cal.App.3d at page 449, a personal injury plaintiff subpoenaed financial records of a defense medical expert for the purpose of determining how much defense work the expert performed. The defendant moved for a protective order and his motion was denied. In directing that a protective order be issued, the Court of Appeal stated: " 'A constitutional amendment adopted in 1974 elevated the right of privacy to an "inalienable right" expressly protected by force of a constitutional mandate. [Citation.] When the interest of a private litigant in discovering relevant facts conflicts with the right of others to maintain reasonable privacy regarding their financial affairs, a court must "indulge in a careful balancing" before ordering disclosure. [Citation.] It follows that a court must not generously order disclosure of the private financial affairs of nonparties without a careful scrutiny of the real needs of the litigant who seeks discovery. . . .' " (*Id.* at p. 453.)

Thus in *Allen,* the court took some care in limiting the level of detail an expert may be compelled to disclose: "To show bias or prejudice, real party need not learn the details of his billing and accounting or the specifics of his prior testimony and depositions. As petitioner points out, publications which index the testimony of medical units are available to real party. Exact information as to number of cases and amounts of compensation paid to medical experts is unnecessary for the purpose of showing a bias." (*Allen v. Superior Court, supra,* 151 Cal.App.3d at p. 453.)

Second, in *Allen* as here, the expert filed a declaration to the effect that if compelled to comply with the subpoena, he would withdraw as an expert. (See *Allen v. Superior Court, supra*, 151 Cal.App.3d at p. 450.) Thus an order requiring extensive financial disclosure may in fact operate as drastically as an order excluding an expert's testimony altogether. Given the large role expert testimony plays in modern civil litigation (see Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2000) ¶¶ 8.1625 to 8.1629, pp. 8J-1 to 8J-2) and the difficulty a litigant may have in both finding a substitute expert and obtaining leave to rely on the substitute's opinion (see Code Civ. Proc., § 2034, subd. (k)), a court must act with great care before entering an order which as a practical matter excludes a designated expert from testifying.

In sum then, while it is clear that in the past Dr. Schwab has not provided information about his practice that would permit meaningful cross-examination, by the same token the trial court's orders, by requiring a precise accounting of Dr. Schwab's expert practice, excessively intrude upon Dr. Schwab's legitimate privacy interests and unnecessarily threaten Stony Brook's right to present expert testimony on a material issue in the case. Thus, although Dr. Schwab should be required to provide a description of his practice sufficient to permit a fact finder to determine whether his opinions in this case have been influenced by any bias in favor of lawyers or parties who have retained his services, the trial court's orders must nonetheless be vacated.

Accordingly, let a writ of mandate issue commanding the trial court to vacate its orders of March 9, 2000, and March 10, 2000, and enter a new order directing that at his deposition Schwab provide plaintiff with the following information covering a three-year period of time:[1] a numerical estimate of defense- and plaintiff-related medical-legal work, including exams, reports and deposition and court testimony, and a numerical estimate of the amount of income generated from said defense- and plaintiff-related litigation. If after a preliminary review of his files Schwab concludes this information can best be gathered by his voluntary use of a third party, such third party may compile the information and the costs shall be borne by Diehl. The trial court may, in its discretion and consistent with the views we have expressed herein, enter such further orders as it deems necessary.

---

[1]We believe the three-year period of time is adequate to show any bias without exposing Schwab to an excessive intrusion into his business affairs.

The parties will bear their own costs with the exception of those noted above.

Work, Acting P. J., and McIntyre, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied January 17, 2000. Mosk, J., was of the opinion that the petition should be granted.