[No. A112761. First Dist., Div. Five. July 11, 2006.]

ROBERT CARPENTER, Petitioner, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent;
YAMAHA MOTOR CORPORATION, USA, Real Party in Interest.

## COUNSEL

Meis & Alexander, Quinton B. Cutlip and Fred G. Meis for Petitioner.

No appearance for Respondent.

Wilson, Elser, Moskowitz, Edelman & Dicker, Ralph W. Robinson and Christine Starkie for Real Party in Interest.

## OPINION

**REARDON, J.***—By petition for extraordinary writ, Robert Carpenter asks us to vacate an order that he submit to a mental examination pursuant to Code of Civil Procedure section 2032.320.[1] He contends the court did not "specify the . . . diagnostic tests and procedures . . . of the examination," as required

---

*Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] Except where otherwise indicated, all statutory references are to the Code of Civil Procedure.

by section 2032.320, in merely ordering that the tests would be limited to "standardized written psychological tests" that evaluated "emotional and cognitive functioning." In addition, Carpenter complains, the court erred in not ordering that he could obtain a copy of the written testing materials and his written answers after the mental examination.

We conclude that the court's order does not comply with section 2032.320. We also conclude that the court was incorrect in ruling that copyright law precluded Carpenter from obtaining a copy of the written test materials. A peremptory writ of mandate shall issue.

## I.  FACTS AND PROCEDURAL HISTORY

### A.  Carpenter's Alleged Mental Impairments

Carpenter filed a lawsuit against real party in interest Yamaha Motor Corporation, USA (Yamaha), seeking damages for personal injuries he sustained while riding his Yamaha motorcycle at a motocross track. According to his petition, a defective accelerator failed as he traversed a jump, his motorcycle pitched forward, and he was thrown headfirst into the ground. According to Yamaha, the accident was caused solely by rider error.

The impact broke Carpenter's neck and compressed his T-4 vertebrae. He also fractured most of his ribs, separated his shoulder, bruised his heart, bit his tongue in half, broke most of his front teeth, and suffered a traumatic brain injury. In addition, Carpenter allegedly continues to suffer from headaches, sensitivity to light, vision problems, problems with smell and taste, pain, weakness, limited movement, memory deficits, and confusion.

Carpenter seeks to recover millions of dollars from Yamaha, contending that he has sustained brain damage affecting all aspects of his cognitive functioning, emotional functioning, and personality. Based on a report from his healthcare providers, cognitive and emotional testing indicates that he suffers from (1) cognitive barriers affecting future employment, including impairment in regard to memory, problem solving and abstract reasoning, and organization, and (2) certain psychological work skill barriers affecting future employment, including impairment in word recognition and auditory comprehension, physical limitations, and difficulty with anger management. In his deposition, Carpenter testified that he suffers from depression, anger, and frustration, as well as problems with his memory, communication skills, and emotions.

B. *Yamaha's Demand for Mental Examination*

On June 29, 2005, Yamaha served Carpenter with a "Demand for Independent Medical Examination," requesting a neurological examination and a neuropsychological examination in the course of a single day on August 1, 2005 (IME Demand). The neurological examination was to be performed by Mark H. Strassberg, M.D., while Ronald H. Roberts, Ph.D., would administer the neuropsychological examination. The IME Demand did not name the tests that would be employed, but advised: "These standard examinations are to consist of patient history and such other routine tests and procedures as may be deemed necessary to determine the existence and nature of bodily and psychological injuries allegedly suffered during the incident which is the subject of this litigation. No physically intrusive or invasive procedures will be performed."

Carpenter served a written response to the IME Demand on July 18, 2005. Among other things, he contended that the reference to "routine tests" was not sufficiently specific, and claimed that "a written test such as the MMPI [Minnesota Multiphasic Personality Inventory] is impermissibly protracted."

The parties met and conferred. By letter to Carpenter's counsel dated August 9, 2005, Yamaha's counsel purported to memorialize a conversation of July 22, 2005, in which the parties agreed that separate physical and mental examinations would be held on September 6, 2005. The letter confirmed that Dr. Strassberg would conduct the physical (neurological) examination, and Dr. Roberts would perform the mental (neuropsychological) examination, which would consist "simply of written tests that can be completed in the same day as the physical examinations." Carpenter's counsel could observe the physical examination, but only audiotape the mental examination. (See §§ 2032.510, 2032.530, subd. (a).)

On August 31, 2005, however, Carpenter's counsel asserted in a hand-delivered letter that the parties had not yet worked out the specifics for the September 6 mental examination. Although Carpenter was agreeable to a mental examination, he (1) objected to Dr. Roberts duplicating Dr. Strassberg's neurological examination; (2) refused to take the MMPI because, he claimed, it was a far-ranging personality inventory exceeding the scope of his injuries; (3) insisted on recording the neurological examination by court reporter; (4) refused to allow extensive questioning regarding medical history; and (5) maintained that Yamaha was required to "set forth precisely what 'written tests' are to be included as part of the mental examination."

Yamaha's attorney wrote back on September 2, 2005. She advised that Dr. Strassberg would actually conduct both a physical examination and neuropsychiatric (mental) evaluation, of which only the physical examination could be attended by counsel. In addition, Dr. Roberts would conduct the psychological (mental) testing, which would not duplicate Dr. Strassberg's interview, and no third party could attend. (§§ 2032.510, 2032.530.) Yamaha defended the use of the MMPI and claimed there was no authority for Carpenter to obtain in advance a list of the particular tests to be administered, since the tests would be selected according to Carpenter's presentation of his condition and an advance list would enable Carpenter to prepare for the tests and manipulate the results.

Carpenter's attorney responded that same day (at approximately 4:45 p.m., one business day before the examination). He insisted that Yamaha should have to identify the specific tests to be used during the mental examination, since any court order for a mental examination under section 2032.320 would have to specify the diagnostic tests and procedures. Carpenter agreed to be physically examined by Dr. Strassberg on September 6, but refused to proceed with the mental examination.

### C. *September 6 Physical (Neurological) Examination by Dr. Strassberg*

Carpenter appeared with his attorney at Dr. Strassberg's office on September 6, 2005. With much interruption by Carpenter's attorney, Dr. Strassberg conducted a physical neurological examination and asked Carpenter some questions to help assess his mental functioning and memory. The mental (neuropsychiatric) examination did not take place.

### D. *Yamaha's Motion to Compel Mental Examination*

Yamaha filed a motion seeking an order "compelling Plaintiff's compliance with the stipulated to and noticed mental examination." In an accompanying declaration, Dr. Strassberg described the nature of the planned mental examination, noting that his "neuropsychiatric examination of Mr. Carpenter" would be "followed by written psychological tests" in which Dr. Roberts would assist. "The written tests," Dr. Strassberg explained, would be "selected in accordance with the nature and scope of the plaintiff's presenting complaints." Further, Dr. Strassberg advised: "We use only *standardized procedures* that are relied upon by other psychiatrists and psychologists. The

tests evaluate *cognitive and emotional functioning*, such as memory, concentration, attention, visual spatial capacity, etc. There will be no procedures which are painful, intrusive or protracted. Mr. Carpenter, as all patients, will be treated with due care and respect." (Italics added.) Dr. Strassberg could not, however, identify in advance the specific tests to be employed: "It may be possible to provide a list of all psychological tests which could possibly be administered, but we cannot provide a list of specifically which psychological tests will be administered, because they will be selected based upon the patient's clinical presentation."[2]

In his opposition to Yamaha's motion, Carpenter did not dispute that Yamaha is entitled to a mental examination, but argued that the court could not issue an order comporting with section 2032.320, because Yamaha never identified the specific diagnostic tests and procedures to be used. As a new matter, Carpenter requested that the court order Yamaha's examiner(s) to provide him with copies of all tests, test responses, and other written communications by Carpenter immediately after the examination.

The trial court's tentative ruling granted Yamaha's motion but directed the parties to meet and confer on the form of the order, which would "list each and every diagnostic test sought to be performed in addition to the other items required by CCP 2032.320(d)."

Both Carpenter and Yamaha contested the tentative ruling and appeared at the hearing on November 30, 2005. After considering the argument of counsel, the court continued the hearing to December 19, 2005, with instructions for counsel to meet and confer to resolve the disputed issues.

The parties were unable to resolve their dispute over the disclosure of the names of the diagnostic tests that might be used. Carpenter proposed a procedure by which he would initially submit to an oral mental examination by Dr. Strassberg, Dr. Strassberg would then determine the psychological tests to be performed, the list of those tests would be conveyed to Carpenter's counsel, and Carpenter could object to any tests his expert deemed inappropriate. Yamaha's counsel rejected this proposal, claiming that the selection of written tests was not made on the basis of the initial oral interview, which had

---

[2] Dr. Strassberg also addressed the reason for using the MMPI. He opined: "The MMPI is one of, if not the most, widely used and relied upon psychological tests in the world. It will almost certainly be administered. An effective psychological evaluation cannot be made without it. I have reviewed Mr. Carpenter's medical records, and it is my opinion that the MMPI is highly relevant to the issues presented in his medical records."

another purpose. Yamaha also refused to provide Carpenter with copies of the written tests and answers at the conclusion of the testing session, on the ground it would violate copyright laws and Dr. Strassberg's ethical obligations. At the hearing on December 19, 2005, the court took the matter under submission.

### E. *The Trial Court's Order*

On December 20, 2005, the court issued its written order, requiring Carpenter to submit to a mental examination by Dr. Strassberg and his assistants and colleagues (presumably Dr. Roberts). Under the heading of "[n]ature of examination," the court provided that the "examination shall test emotional and cognitive functioning." Under the heading of "[m]anner, diagnostic tests and procedures, conditions, and scope," the court ruled that Carpenter could audiotape the examination, but no third party (including his counsel or court reporters) could attend. The court also set forth the following schedule: "At 8:30 am Mr. Carpenter shall be asked to fill out preliminary paperwork. He may obtain copies of these forms. [¶] At approximately 9 am Dr. Strassberg shall conduct a neuropsychiatric interview. The interview will last approximately 2–3 hours depending upon the medical presentation, necessary breaks, and audiotaping issues. [¶] There will be a one hour break for lunch. Mr. Carpenter may choose a shorter time for lunch. Depending upon the time of morning when the interview ends, Mr. Carpenter may choose to begin some of the written testing before taking the lunch break. [¶] Following the interview (and possibly the lunch break depending upon when Mr. Carpenter chooses to take lunch), *standardized written psychological tests* shall be administered to Mr. Carpenter. No standardized written psychological tests are specifically prohibited from the examination, because plaintiff's opposition has cited no authority in support of such a position. The written testing will likely last 4–5 hours, but it may last approximately 6 hours depending upon the medical presentation, necessary breaks and the audiotaping process. [¶] If Mr. Carpenter insists upon reading every written question into the audio tape, the examination may need to be continued to a further day." (Italics added.)

In addition, the court ruled that Carpenter was not entitled to receive a copy of the testing materials: "[T]hese are standardized tests, and the names of the tests are sufficient to allow the plaintiff and/or his retained psychological expert to determine precisely what questions were asked. It is not possible to provide a copy of the exam questions following the examination, as it would be a copyright infringement for each of the standardized

tests." The court also noted that Carpenter could obtain a copy of the physician's report after the examination (§ 2032.610) and take the deposition of Yamaha's disclosed experts (§ 2034.410).

## II. *DISCUSSION*

As mentioned, Carpenter raises two issues: (1) whether the trial court complied with the requirement of section 2032.320 to "specify the . . . diagnostic tests and procedures . . . of the examination" by ordering "standardized written psychological tests" of "emotional and cognitive functioning;" and (2) whether the court abused its discretion in failing to allow him to obtain a copy of the written testing materials and his written answers. We address each contention in turn.[3]

### A. *Specifying Diagnostic Tests and Procedures Under Section 2032.320*

■ Civil discovery by physical and mental examination is governed by sections 2032.010 through 2032.650. As a general matter, a defendant may obtain a physical or mental examination of the plaintiff, in accordance with those provisions, if the plaintiff has placed his or her physical or mental condition in controversy. (§ 2032.020, subd. (a); see § 2032.310.)

The procedure for obtaining certain physical examinations differs somewhat from the procedure for obtaining a mental examination. If the plaintiff seeks recovery for *personal injuries*, the defendant may obtain one physical examination of the plaintiff by serving a demand, without leave of court, as long as the examination does not include "any diagnostic test or procedure that is painful, protracted, or intrusive" and is conducted within 75 miles of the plaintiff's residence. (§ 2032.220, subd. (a).) The demand must specify the "time, place, manner, conditions, scope, and nature of the examination." (§ 2032.220, subd. (c).)

---

[3] Yamaha suggests that, since the trial court found there was an *agreement* to proceed with a mental examination, the requirements of section 2032.320 do not apply. We are not convinced. It may be permissible for parties to stipulate to a mental examination in which the plaintiff remains ignorant of the tests and procedures to be performed, contrary to section 2032.320. But here, notwithstanding the parties' general agreement that a mental examination would be appropriate, there was no agreement as to the specific tests and procedures to be employed, or whether those tests and procedures would have to be identified in advance. To the contrary, Carpenter insisted that Yamaha had to make this disclosure even if the parties proceeded by stipulation, because it would be a necessary component of a court order anyway.

■ If, as here, the defendant wants to obtain discovery by a *mental examination* (or by a physical examination other than that described in § 2032.220 et seq.), the defendant must obtain leave of court. (§ 2032.310, subd. (a).) The motion for a mental examination, like the demand for a physical examination under section 2032.220, "shall specify the time, place, manner, conditions, scope, and nature of the examination, as well as the identity and the specialty, if any, of the person or persons who will perform the examination." (§ 2032.310, subd. (b).)

Section 2032.320 governs the order granting a motion for a mental examination. To protect the plaintiff's privacy interests from unnecessary intrusion, the mental examination may be ordered only upon a showing of good cause. (§ 2032.320, subd. (a); see *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 840 [239 Cal.Rptr. 292, 740 P.2d 404] (*Vinson*) [former § 2036]; *Sporich v. Superior Court* (2000) 77 Cal.App.4th 422, 427–428 [91 Cal.Rptr.2d 752] [former § 2032, subd. (d)].)[4] In addition, and ostensibly for the same purpose, the court in its order must set forth certain details of the examination: "An order granting a physical or mental examination *shall specify the* person or persons who may perform the examination, as well as the time, place, manner, *diagnostic tests and procedures*, conditions, scope and nature of the examination." (§ 2032.320, subd. (d), italics added.) The requirement that the order "specify the . . . diagnostic tests and procedures" does not appear in the requirements for a demand for a physical examination (§ 2032.220) or the requirements for the motion for a mental examination or other physical examination (§ 2032.310).

■ At issue here is the meaning of the requirement that the court "specify the . . . diagnostic tests and procedures . . . of the examination." This question of statutory interpretation is a matter of law on which we exercise our independent judgment to discern the intent of the Legislature. We begin with the statutory language, according each word a commonsense meaning based on the language used and the evident purpose of the statute. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641] (*Hughes*).) If the language is unambiguous, there is no need for judicial construction. (*Ibid.*) If the language is susceptible to more than one reasonable meaning, we turn to standard rules of statutory construction and consider other indicia of legislative intent, such as legislative history. (See *id.* at p. 776.)

---

[4] Under the 1986 California Discovery Act, mental examinations were addressed in section 2032. Effective July 1, 2005, section 2032 was renumbered 2032.010–2032.650, without substantive change.

### 1. *Plain Meaning of Section 2032.320*

■ The word "specify" means to speak of fully or in detail. (Oxford English Dict. (2d ed. CD-ROM 1989).) The plain meaning of section 2032.320, therefore, is that the court is to describe *in detail* who will conduct the examination, where and when it will be conducted, the conditions, scope and nature of the examination, *and* the diagnostic tests and procedures to be employed. The way to describe these "diagnostic tests and procedures"—*fully* and *in detail*—is to list them by name.

Yamaha argues that a trial court can just mention the *types* of diagnostic tests and procedures (such as "written standardized tests" evaluating "emotional and cognitive functioning"), because section 2032.320 does not *expressly* state that "each and every diagnostic test must be individually named." Yamaha's argument is unpersuasive, for several reasons.

First, it was unnecessary for the Legislature to include the language Yamaha suggests, since the language it did use—"shall specify the . . . diagnostic tests and procedures"—plainly means the same thing. Indeed, given the clarity of the language chosen by the Legislature, it is not significant that the statute omits an explanation that each test be named; but it is quite significant that the statute omits any statement that the mere type or category of test can be mentioned.

■ Second, the mere description of test "types" is the kind of information that satisfies another requirement, also in section 2032.320, that the court specify the "scope, and nature" of the examination. The Legislature's separate mandate that the court also specify the "diagnostic tests and procedures" imposes something more than identification of the general "types" or categories of tests. (See *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 330 [87 Cal.Rptr.2d 423, 981 P.2d 52] ["[W]henever possible, significance must be given to every word in pursuing the legislative purpose, and the court should avoid a construction that makes some words surplusage."].)

Third, while no published decision has determined how a court must describe "diagnostic tests and procedures" under section 2032.320, at least one decision has confirmed that other information required in an order granting a mental examination—the dates of the examination and identity of the examiner—must be stated with particularity. In *Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 492 [122 Cal.Rptr.2d 673] (*Baqleh*), mental evaluations administered pursuant to the Penal Code had produced inconsis-

tent conclusions as to a criminal defendant's competency to stand trial. The prosecution thereafter sought an order requiring the defendant to " 'submit to a reasonable examination by duly licensed psychiatrists and/or psychologists retained by the People,' " at " 'a maximum of five sessions, of no longer than four hours per session, scheduled between the hearing on this motion and February 15, 2002.' " (*Baqleh, supra,* at pp. 491–492.) The trial court granted the motion, ordering the defendant to " 'submit to an evaluation by a psychiatrist retained by the prosecution, as requested by the prosecution in this case.' " (*Id.* at p. 491, italics omitted.) The Court of Appeal ruled that the order was erroneous, because the trial court failed to comply with the applicable discovery statute for mental examinations. In particular, the court observed, former section 2032, subdivision (d) (the predecessor to § 2032.320) required the motion to specify " 'the time, place, manner, conditions, scope, and nature of the examination, as well as the identity and the specialty, if any, of the person or persons who will perform the examination,' " yet neither the motion nor the order had specifically identified the examiner and the time of the examination, or limited the " 'scope and nature' " of the examination to the question of mental competency to stand trial. (*Baqleh, supra,* at pp. 491–492; see *id.* at pp. 484–485.) The specificity required in *Baqleh* as to the examiner and examination date should apply as well to the diagnostic tests and procedures.

Fourth, the need to identify the "diagnostic tests and procedures" with specificity furthers the evident purpose of the statute. Section 2032.320 applies to mental examinations, as well as physical examinations other than the first physical examination of a personal injury plaintiff under section 2032.220—for instance, where there are multiple physical examinations or the proposed procedures will be painful, protracted, or intrusive. Thus, in the instances covered by section 2032.320, there is a heightened risk of undue mental or physical invasion. Moreover, in the case of mental examinations, the plaintiff may not be accompanied by his attorney or other representative who can protect the plaintiff's interests. Requiring the court to identify the permissible diagnostic tests and procedures, by name, confirms that the court has weighed the risks of unwarranted intrusion upon the plaintiff against the defendant's need for a meaningful opportunity to test the plaintiff's claims of physical or mental injury. Furthermore, the resulting specificity and clarity of the order will also aid the *examiner* in understanding and complying with the parameters imposed by the court.

In sum, the plain meaning of section 2032.320 is that the trial court must "specify the . . . diagnostic tests and procedures" of the mental examination

by naming the tests and procedures to be performed. Yamaha's remaining arguments—based on a federal district court decision, legislative history, and the claimed effect of our ruling on the efficacy of the examination and motion practice—are addressed next.

### 2. Ragge *and the Federal Rules of Civil Procedure*

Yamaha notes that former section 2032 was based on rule 35(a) of the Federal Rules of Civil Procedure (28 U.S.C.) (rule 35). (*Vinson, supra,* 43 Cal.3d at p. 839 & fn. 4; *Doyle v. Superior Court* (1996) 50 Cal.App.4th 1878, 1887 [58 Cal.Rptr.2d 476].) The California Discovery Act of 1986, which introduced the requirement of specifying diagnostic tests and procedures along with many other provisions, was generally patterned after the Federal Rules of Civil Procedure as well. On this basis, Yamaha urges us to follow the federal district court decision in *Ragge v. MCA/Universal Studios* (C.D.Cal. 1995) 165 F.R.D. 605 (*Ragge*), proclaiming that it "involves precisely the same issues presented in the underlying motion." Yamaha is incorrect.

In *Ragge,* a plaintiff filed a lawsuit in federal court, claiming damages for emotional distress. The defendant sought a mental examination under rule 35, which reads in part: " 'The *order [for a mental examination]* may be made only on motion for good cause shown and upon notice to the person to be examined and to all parties and *shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made.'* " (*Ragge, supra,* 165 F.R.D. at p. 608, italics added.) The plaintiff opposed the motion, insisting inter alia that the examiner disclose in advance the specific tests to be administered at the examination. (*Id.* at p. 607.) A declaration submitted by the defendant's doctor had set "forth the nature of the examination to be conducted, including the types of psychological tests he may choose to administer." (*Id.* at p. 609.) There was no indication that anything unusual or improper was proposed. (*Ibid.*) The court concluded under rule 35 of the Federal Rules of Civil Procedure that no purpose would be served by requiring the defendant's mental examiner "to select, and disclose, the specific tests to be administered in advance of the examination." (*Ragge, supra,* at p. 609.)

*Ragge* stands for the proposition that the "manner, conditions and scope of the examination" under rule 35(a) of the Federal Rule of Civil Procedure can be satisfied by the examiner's identification of the "types of tests" that will be employed. This language in rule 35(a) was identical to the language of an *earlier* version of former section 2032. (*Reuter v. Superior Court* (1979) 93

Cal.App.3d 332, 335, fn. 2 [155 Cal.Rptr. 525].) But former section 2032 was amended by the Civil Discovery Act of 1986 to add the language that now is included in section 2032.320, requiring not just specification of the manner, conditions and scope of the examination, but also specification of the "diagnostic tests and procedures." Rule 35(a) does not require what is required by section 2032.320, and *Ragge* is not on point.

■ Nor does the discussion in *Ragge* otherwise persuade us that it would be inappropriate to compel advance disclosure of the test names. Yamaha refers us to a passage in which the *Ragge* court stated: "Because the mental examination provides one of the few opportunities for a defendant to have access to a plaintiff, and the only opportunity for a defendant to have a plaintiff examined by defendant's expert, some preference should be given to allowing the examiner to exercise discretion in the manner and means by which the examination is conducted, provided it is not an improper examination." (*Ragge, supra,* 165 F.R.D. at p. 609.) In general, we have no quarrel with this proposition. Certainly the examiner should have some discretion in choosing the manner and means of conducting the examination—but only as long as the tests he or she proposes are not unduly invasive or otherwise inappropriate. The way to assure that the tests do *not* make the examination "improper," as *Ragge* puts it, is to require the court to name the tests in its order. This assures that the court has considered any objections to the tests and provides the examiner clear parameters for the examination.

3. *Legislative History*

■ Yamaha urges us to consider the legislative history of section 2032.320 because, Yamaha claims, the statute is ambiguous. In particular, Yamaha contends that section 2032.320 is "arguably ambiguous" because it requires the order for a mental examination to specify more information than the motion. It is "arguably latently ambiguous," Yamaha adds, because providing the test names in advance allows a plaintiff to prepare and manipulate the results. (See *In re Marriage of Campbell* (1999) 74 Cal.App.4th 1058, 1062 [88 Cal.Rptr.2d 580] [legislative history may be considered in cases of latent ambiguity].)

We do not agree that section 2032.320 is ambiguous for the reasons Yamaha asserts. The clear statutory requirement to specify the diagnostic tests and procedures in the order does not become ambiguous merely because

another statutory provision fails to expressly require the moving party to specify the tests and procedures.[5] Furthermore, as explained *post*, there is nothing in the record to support Yamaha's assertion that advance knowledge of the test names will enable a plaintiff to skew the results of the mental examination. Nevertheless, we consider the legislative history of section 2032.320, if only to confirm that it contains nothing contrary to our reading of the statute.

The language explicitly requiring the order for a mental examination to "specify" the "diagnostic tests and procedures" first appeared in former section 2032, subdivision (d), as a result of amendments imposed by the Civil Discovery Act of 1986. The portion of the Civil Discovery Act of 1986 pertaining to mental examinations was introduced as California State Assembly Bill No. 1334 (1985–1986 Reg. Sess.) (Bill No. 1334). The content of Bill No. 1334 in turn originated from a proposed revised Discovery Act, presented to the Legislature in January 1986 by the State Bar/Judicial Council Joint Commission on Discovery (Commission). The Commission's proposed Discovery Act included reporter's notes, which discussed the potential substantive changes.

While former section 2032 as it then existed provided that "[t]he order . . . shall specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made," (Stats. 1980, ch. 1206, § 1, p. 4066), the new provision proposed by the Commission required that *the motion* would have to specify the "time, place, manner, conditions, scope, and nature of the examination, as well as the person or persons who will perform the examination," and *the order* would have to specify "the person or persons who may perform the examination, and the time, place, manner, *diagnostic tests and procedures*, conditions, scope and nature of the examination." (Italics added.)

According to the Commission's reporter's notes, the proposed amendment to former section 2032 "articulate[d] a requirement, perhaps *implicit in the present statute*, that *the motion* itself be quite specific as to the time, place, nature, scope, etc. of the examination sought." (Italics added.) Although

---

[5] Yamaha argues that the difference between sections 2032.310 and 2032.320 indicates the trial court has discretion not to specify the diagnostic tests if it wants. We fail to see how a statutory requirement to "specify the . . . diagnostic tests and procedures" in an order can be properly ignored by the court merely because the moving party has omitted the information the court needs to issue the order. The court's duty in this instance is not to turn a blind eye to the legislative mandate, but to deny the motion. The prudent defendant, cognizant of the requirements of section 2032.320, will include the necessary information in its motion, whether expressly required to do so by section 2032.310 or not.

Carpenter seizes upon this remark as evidence that the Legislature believed the existing language of former section 2032 implicitly required specification of the diagnostic tests and procedures, we are not persuaded. The remark referred to the new requirements for the *motion* for a mental examination, not the new language regarding the order granting the examination. Only the latter included the phrase "diagnostic tests and procedures."

Carpenter also points us to a typed document, prepared at some unknown time by some unidentified author, expressing someone's concern that requiring the order to specify the diagnostic tests and procedures might unduly limit the examiner or be impossible until after an initial interview: "Problems [¶] . . . [¶] is not the court's interference into what tests etc. can be done, unduly limiting a professional bound by rules of ethics, etc? often [*sic*] not know [*sic*] what tests etc are appropriate untill [*sic*] initial interview completed. [¶] [I]sn't this essentially going to require that every examination sought will be throu[gh] motion? [¶] [I]s the old way abused or require hearing now?"

This passage, however, has little significance. In the first place, we cannot identify the maker of the statement or the context in which it was made. Moreover, the legislative record does not contain any response. From the fact that Bill No. 1334 was passed, it could be construed that the Legislature believed the specification of the diagnostic tests and procedures was appropriate, notwithstanding the concerns that had been raised. On the other hand, it could also be concluded that the Legislature rejected the implication that the new statutory language would compel the disclosure of each and every test. Given this uncertainty, the unidentified statement is unhelpful to our analysis.

Having considered the material submitted by the parties, we conclude there is no competent evidence of any express discussion of the "diagnostic tests and procedures" language in the legislative history of Bill No. 1334.[6]

Yamaha makes two arguments in connection with legislative history. First, it notes that one of the purposes of the Civil Discovery Act of 1986 was to bring California provisions generally more in line with their federal counterparts. As mentioned in the Senate Rules Committee Report of August 25, 1986: "*In general*, the revisions would bring California law closer to the discovery provisions of the Federal Rules of Civil Procedure." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill

---

[6] The parties have submitted to us the proposed California Civil Discovery Act of 1986, the reporter's notes, amendments to Bill No. 1334, documents reflecting deliberations in the Assembly and Senate, correspondence from the files of the bill's author, and other material.

No. 1334 (1985–1986 Reg. Sess.) Aug. 25, 1986, p. 3, italics added.) We accept that, "[i]n *general*," that was the intent of our Legislature. As to former section 2032 in particular, however, the Legislature elected *not* to preserve the language that was identical to rule 35(a), but instead to add language that made the California statute read *differently* than rule 35(a). Moreover, even if we concluded that our Legislature had desired to keep former section 2032 in line with rule 35(a), it would not resolve the matter before us: there was no published federal decision addressing the specificity required under rule 35(a) as of the time Bill No. 1334 was passed. *Ragge* was decided nearly a decade later.

Next, Yamaha notes that Bill No. 1334 amended not only former section 2032, pertaining to physical and mental examinations, but also former section 2034, which addressed discovery of expert witnesses. The text of former sections 2032 and 2034, Yamaha contends, shows that the Legislature intended a mutual exchange of information between litigants, to promote the efficient resolution of cases: sections 2032.610 and 2032.640 provide for a mutual exchange of doctor's reports within a reasonable time after the physical or mental examination; and sections 2034.210, 2034.260, and 2034.410 provide for a mutual exchange of expert names and reports and the opportunity to take the deposition of the other party's potential expert witnesses. In addition, the Legislature noted its intent to further efficient and forthright discovery: "[T]he purpose of this Act [Bill No. 1334] is to promote the just, speedy, and economical determination of civil actions by providing parties with mutual knowledge of the information needed to resolve their disputes. Given this purpose, each litigant and each attorney has a duty to conduct and to respond to discovery in a manner that is honest, forthright, cooperative, prompt, and cost-efficient." (Chief Counsel Rubin R. Lopez, letter to Assemblyman Elihu M. Harris, Nov. 6, 1986.)

In light of the legislative intent to further the mutual exchange of information in pretrial discovery, Yamaha contends that the plain meaning interpretation of the language of section 2032.320 is incorrect. In particular, Yamaha urges, by seeking advance disclosure of the names of the tests the defendant's examiner will use, or by seeking disclosure of the written test questions after the examination, "plaintiff is demanding that the defendant produce more information regarding the plaintiff's alleged injuries, than what the plaintiff is willing to produce in support of his own injuries."

Yamaha's concern is misplaced. Certainly the Legislature intended the Civil Discovery Act of 1986 to lead parties and counsel to be forthright in

producing discoverable information. But this goal cannot be interpreted to *limit* the disclosure a defendant must provide a plaintiff before subjecting him to a battery of mental tests, or to deprive the trial court of the opportunity of determining whether any of those tests may be inappropriate. Nor is there any indication in the legislative history of Bill No. 1334 that its general mission of encouraging the forthright and efficient exchange of information should render the phrase, "specify the . . . diagnostic tests and procedures" to have anything other than its plain meaning.

### 4. *Section 2032.320 in Practice*

Insisting that section 2032.320 means what it says—that the diagnostic tests and procedures must be specified—will result in an orderly and efficient means of balancing the interests of the plaintiff and defendant. The defendant, aware that the court must name the diagnostic tests and procedures in the order granting a mental examination, will identify the potential tests and procedures in its moving papers. The plaintiff, assisted by counsel and a psychologist or other expert, may consider whether the proposed tests are inappropriate, irrelevant, or abusive, and submit evidence and argument to that effect if necessary. If the parties cannot agree on the specific tests that may be employed, the matter will be resolved by the court in deciding the defendant's section 2032.310 motion.[7]

Yamaha expresses two concerns. First, it argues that disclosure of the names of the tests, before the mental examination, would allow the plaintiff to prepare for the tests and manipulate the results. The record in this matter, however, contains no support for Yamaha's position. Dr. Strassberg did not assert any such danger in his declaration in support of Yamaha's motion. Nor did Yamaha present any other evidence that a plaintiff, knowing what tests might be used, could prepare for the tests and manipulate them, much less manipulate them in a manner undetectable to the examiner. In correspondence Yamaha submits to us from publishers of the MMPI and other written psychological tests, it is contended only that disclosure of the *test materials themselves* before the examination could affect the integrity of the test. It is not asserted that identification of the *names* of the proposed tests would pose

---

[7] In the trial court, the parties debated whether section 2032.320, subdivision (d), could be satisfied by a two-step process, in which the plaintiff undergoes an initial oral interview with the examiner, the examiner determines and discloses what tests will be used, the plaintiff has an opportunity to object to any of the proposed tests, and, after any remaining disputes are resolved, the mental examination by written test goes forward. Yamaha objected to this procedure, on the ground that the written tests are not selected in the course of an interview, and the interview has a distinct purpose. Now Carpenter dislikes the idea as well. The trial court made no findings as to this procedure.

the same risk. Indeed, we find the prospect unlikely, since the actual test questions are a carefully guarded secret among the publishers and examiners: identification of just the names of the tests—while meaningful to the plaintiff's psychologist for purposes of determining their relevance—would not likely lead to the plaintiff gaining access to the actual questions.[8]

Second, Yamaha admonishes that extensive motion practice will arise if a defendant is forced to disclose in advance the mental tests to which it may subject the plaintiff. Yamaha foresees that psychologists will provide a list of potential tests, the parties will never agree on the propriety of the tests, motions will be brought, and "[e]ach individual psychological test will be on trial," with the tests "in abstentia" because they are subject to copyright protection. Further, Yamaha warns, trial judges will not be competent to evaluate and compare the psychological tests and determine which ones should be allowed.

Not so. In the first place, even without an obligation to specify the diagnostic tests and procedures, mental examinations are often obtained by motion practice, since a court order is required. (§ 2032.320; see former § 2032.) While it is possible for parties to forgo a contested motion by stipulating to the mental examination, such a stipulation seems just as likely, if not more likely, where the defendant forthrightly discloses the names of the potential tests rather than refusing to let the plaintiff know what tests might be used. Furthermore, there is no indication in the record that motions to obtain mental examinations will become more onerous if defense counsel, anticipating the need of the court under section 2032.320, names the proposed tests in its moving papers. The plaintiff is obligated to object to the proposed tests only in good faith, the litigants must meet and confer in good faith, and the trial court is empowered to deal with those who choose not to. While the court may have to make more specific decisions about individual tests, it is untenable to say that, in some vague hope of avoiding more complicated motions, plaintiffs and their counsel must be kept in the dark as to what the defendants' mental examiners intend to do, contrary to the plain language of a statute and the evident intent of our Legislature.

Nor are we persuaded that the copyright protection purportedly afforded the psychological tests would hamper the process. For a party to argue whether the test should be administered, it may not be necessary to give the

---

[8] We also note that Yamaha and Dr. Strassberg expressed no hesitancy in advising Carpenter's counsel that the MMPI would almost certainly be administered. Even if learning the names of the tests could enable the plaintiff to prepare for the examination, it would not compel the conclusion that the test names should be omitted from the order. For example, the order could be sealed, and deemed for the eyes of the parties' counsel and retained psychologists only.

court a copy of the actual test. To the extent a copy of the test must be provided, we note that copies of published court decisions and other copyrighted materials are submitted along with motions rather routinely. And to maintain the secrecy of the test content, the materials could be filed under seal, similar to the procedure employed when filing trade secret or other confidential material.

Lastly, we disagree that trial courts lack the competence to determine whether there is good cause for particular psychological tests. Courts are routinely called upon to decide similar matters that may exceed the personal experience of an individual judge, based on the evidence and arguments submitted by the parties.

In the final analysis, section 2032.320 requires the trial court to list by name the diagnostic tests and procedures to be employed in the mental examination. Yamaha gives us no reason to depart from this clear mandate.

### 5.  *The Trial Court's Order Must be Vacated*

■    In the matter before us, the court ordered Carpenter to submit to "standardized written psychological tests" to "test emotional and cognitive functioning." The order did not set forth the names of the tests. Nor does the record demonstrate that "standardized written psychological tests" for evaluating "emotional and cognitive functioning" has so precise and finite a meaning in the mental health profession as to be the functional equivalent of a list of specific tests. The order does not comply with section 2032.320.

Yamaha refers us to *Bittle v. Superior Court* (1976) 55 Cal.App.3d 489 [127 Cal.Rptr. 574] (*Bittle*), for the proposition that an order for an examination may not be erroneous even though it fails to comply precisely with procedural requirements. In *Bittle*, the trial court required a personal injury plaintiff to appear for a *physical* examination pursuant to former section 2032, subdivision (a). (*Bittle, supra,* at p. 491.) The plaintiff filed a petition for a writ of mandate, contending that the order failed to " 'specify the time, place, manner, conditions, and scope of the examination and the person or persons by whom it is to be made,' " since it did not state a specific time or place for the examination or the name of the doctor. (*Id.* at p. 494.) The Court of Appeal held that the failure to repeat these particulars in the order did not make the order defective per se, since the scope of the examination was clear from the order *and notice of motion,* taken together, and the lack of specificity was to some extent due to the plaintiff's counsel. (*Id.* at pp. 494–495.) The appellate court also rejected plaintiff's contention that the defendants had failed to show good cause for the examination by failing to state " 'the precise physical examination requested' " or specific facts warranting the examination. (*Id.* at p. 496.) It would have been difficult to make

the notice of motion more specific, the court concluded, since it incorporated plaintiff's extremely broad allegations of her injuries. (*Ibid.*)

*Bittle* does not help Yamaha, because it was decided under an earlier statute governing physical examinations (former § 2032, subd. (a)), not the current section governing mental examinations (§ 2032.320). Unlike the provision at issue here, former section 2032, subdivision (a), did not require the order to "specify the . . . diagnostic tests and procedures." Furthermore, to the extent *Bittle* stands for the proposition that the specificity requirement can be satisfied by details set forth in the *motion* papers, Yamaha's motion papers did not name the specific diagnostic tests and procedures to be employed.

We recognize that Dr. Strassberg claimed he could not identify in advance all of the specific tests he would eventually conduct, since the ultimate selection depended upon Carpenter's presentation of his injuries during the mental examination. But certainly, for Yamaha to have requested the mental examination in good faith, Dr. Strassberg had to have known of *some* tests that he would necessarily administer. Indeed, Dr. Strassberg averred that he would "almost certainly" administer the MMPI, in light of his review of Carpenter's records. He also stated that he could provide a list of all the tests that *could* be administered—in other words, the written standardized tests from which he would select in testing Carpenter's emotional and cognitive functioning. Given the limited time allotment of four to six hours to conclude all the written testing including the MMPI, it is surprising that the parties could not have come to a reasonable agreement on the tests to be used that afternoon. Because Dr. Strassberg's list of potential tests was never disclosed by Yamaha or demanded by Carpenter, it cannot be said that the task was too daunting for the parties—only that they refused to try.[9]

The trial court erred, and the order granting the mental examination must be vacated. A peremptory writ shall issue. Because the parties do not dispute that a mental examination of Carpenter is appropriate, the parties shall meet and confer concerning the specific tests that Yamaha's examiner may employ, with any remaining disputes to be resolved by the trial court.[10]

---

[9] If an examiner determines in his or her professional judgment, during the course of the mental examination, that an alternative or additional test should be administered, the parties may meet and confer and, if necessary, return to the trial court to resolve any dispute. The possibility that an additional test may not be ordered will encourage defendants to be forthright in their initial request; the potential that the mental examination may be reconvened will encourage plaintiffs to negotiate reasonably as well. Most matters should be foreseen and addressed in the initial motion, or at the latest upon a good faith meet-and-confer when the matter arises.

[10] We note that this was, in fact, the substance of the trial court's initial ruling.

### B.  *Provision of Copies of Written Test Questions and Answers*

Although we vacate the order granting the mental examination, we consider Carpenter's further contention that he should be provided with a copy of the test questions and answers after the mental examination, due to the likelihood that an order granting a mental examination will eventually be ordered and the issue will arise again.

In his opposition to Yamaha's motion to compel, Carpenter requested that the examiner be ordered to "provide copies of any and all written communications with plaintiff at the conclusion of the testing session," including written test questions and answers (e.g., scantron sheets).

The court did not explicitly rule whether Carpenter should be provided a copy of his written answers to the tests. It did order that Carpenter could audiotape the mental examination, and that Carpenter could read the written questions (and presumably his answers) onto the tape, but that the written test questions could not be provided to him due to copyright law. Specifically, the court ruled: "Mr. Carpenter may if he chooses audiotape the examination. . . . [¶] . . . [¶] If Mr. Carpenter insists upon reading every written question into the audiotape, the examination may need to be continued to a further day. However, these are standardized tests, and the names of the tests are sufficient to allow the plaintiff and/or his retained psychological expert to determine precisely what questions were asked. It is not possible to provide a copy of the exam questions following the examination, as it would be a copyright infringement for each of the standardized tests."

In his writ petition, Carpenter maintains that he is entitled to copies of the written test materials and his answers, because the statute governing physical examinations allows for stenographic or audio recordation, and the statute governing mental examinations allows an audio recording. (§§ 2032.510, 2032.530.) The fact that section 2032.530 permits the mental examination to be *audio*taped, however, does not provide statutory authority for compelling the examiner to provide a copy of the written test questions and answers.

While there is no express statutory authority for Carpenter's position, neither is there statutory authority precluding a trial court, in its discretion, from ordering the disclosure of the written test questions and answers. (See *Golfland Entertainment Centers, Inc. v. Superior Court* (2003) 108 Cal.App.4th 739, 747 [133 Cal.Rptr.2d 828] (*Golfland*) [court retains discretion in discovery matters to take prophylactic measures other than those required by statute].) This discretion should be exercised, Carpenter urges, because his rights to take discovery of and cross-examine Yamaha's expert witnesses are not meaningful unless he obtains copies of the test questions

and answers on which the experts' opinions are based. (See § 2034.410; Evid. Code, § 721, subd. (a).) Further, he argues, the disclosure of the actual test questions and answers will protect against abuse and subsequent disputes over what occurred. (See *Golfland, supra,* at p. 750 [purpose of permitting recording of mental examination is to ensure the examiner does not overstep the bounds for the examination, the context of the responses can be judged at trial, the examinee's interests are protected, and evidence of abuse can be presented to the court]; see also *Gonzi v. Superior Court* (1959) 51 Cal.2d 586, 589 [335 P.2d 97] [court reporter should be present during physical examination because the plaintiff and the defendant's examiner may recall their communications differently].)

Because the resolution of this matter is for the discretion of the trial court, we would ordinarily review the court's determination for an abuse of discretion. (See *Golfland, supra,* 108 Cal.App.4th at p. 747.) In the matter before us, however, the court's decision to deny access to the written test questions was based on a conclusion regarding copyright law, which, as shown *post,* was erroneous. We therefore discuss the copyright issue, and the issue of professional and ethical obligations raised by Yamaha, and leave the matter for further consideration by the trial court.

### 1. *Copyright Protection for Test Questions*

■ Federal law grants copyright owners the exclusive right to copy and distribute copyrighted works. (17 U.S.C. § 106(1) & (3).) With certain exceptions, original works of authorship receive copyright protection once fixed in tangible form. (*Ibid.*) Components of the MMPI test have been held protected by copyright law. (*Applied Innovations v. Regents of the U. of Minn.* (8th Cir. 1989) 876 F.2d 626, 634–636.) Yamaha also contends that standardized tests, such as those provided to evaluate emotional and cognitive functioning, may be copyrighted as "secure tests." (See *Chicago Bd. of Educ. v. Substance, Inc.* (7th Cir. 2003) 354 F.3d 624, 627 [involving the Chicago Academic Standards Exams].)[11]

Yamaha contends that copyright law precludes providing Carpenter with a copy of the written tests that Dr. Strassberg might use. At the outset, we note that Yamaha itself is not the copyright owner, or even the licensee of the copyright holder. Nor has it indicated how Yamaha might be liable under copyright law if it complied with a court order to produce the tests to the

---

[11] A secure test is a "nonmarketed test administered under supervision at specified centers on specific dates, all copies of which are accounted for and either destroyed or returned to restricted locked storage following each administration. For these purposes a test is not marketed if copies are not sold but it is distributed and used in such a manner that ownership and control of copies remain with the test sponsor or publisher." (37 C.F.R. § 202.20(b)(4).)

opposing party in litigation. It appears Yamaha is really arguing that Dr. Strassberg would exceed the scope of his contractual obligations if he copied the tests and distributed them to Carpenter; or, perhaps, that the copyright protection afforded the test questions should preclude on public policy grounds any order that Dr. Strassberg disclose them.

The evidence before the trial court, however, was insufficient to support the finding that providing a copy of the tests "would be a copyright infringement for each of the standardized tests." The material before the court did not indicate what tests Dr. Strassberg would use, or the terms by which Dr. Strassberg came into possession of the tests, or any limitations on their disclosure. Even if it could be presumed that all "written standardized tests" evaluating emotional and cognitive functioning were subject to copyright protection, it was not established that providing a copy of the test questions, after an examination and by court order, would violate copyright law in every instance. Given the state of the record, the trial court erred.

For the benefit of the parties and trial court upon remand, we next consider the material Yamaha has presented to us from two of the copyright holders of certain standardized psychological tests. According to correspondence purportedly received by Yamaha, NCS Pearson, Inc. (Pearson), is the publisher of the MMPI, the MMPI-2, and other standardized psychological tests commonly used to evaluate emotional and cognitive functioning. Pearson contends that the MMPI, the test booklet, the scoring software, and other test materials are protected by copyright. Further, Pearson asserts, it distributes these tests only to qualified professionals subject to a binding contract, and protection of the validity of the tests requires restriction of the test content to qualified professionals bound by ethical obligations to maintain test integrity.

Additional correspondence provided by Yamaha indicates that Harcourt Assessment, Inc. (Harcourt) is the publisher and copyright owner in regard to the Wechsler Adult Intelligence Scale—Third Edition (WAIS-III), the Wechsler Memory Scale—Revised and Third Editions (WMS-R & WMS-III), the California Verbal Learning Test—Second Edition (CVLT-II), and the Raven's Standard Progressive Matrices. Harcourt considers these tests to be secure tests, treats them as trade secrets, and views the test questions and "answers" (presumably, answer sheets as opposed to an examinee's responses) to be highly confidential proprietary information. These materials are sold only to qualified individuals who are bound by the ethical standards of their profession to protect the integrity of the materials by maintaining the confidentiality of the test items and answers. As a condition of the sale, purchasers must limit access to the test materials to qualified persons who agree to safeguard their use, and release the materials only to persons qualified to interpret and use them properly.

What Yamaha fails to mention, however, is that both Pearson and Harcourt also suggest a satisfactory means by which the tests *can* be provided after the mental examination. In essence, the publishers propose, the test questions and answers may be given to plaintiff's counsel or a designated psychologist, subject to a protective order strictly limiting the use and further disclosure of the material, and providing for other safeguards against access that would compromise the integrity and validity of the tests.

In its letter to Yamaha's counsel, Pearson explained: "To the extent possible, we suggest that these protective agreements and orders include the following elements: (a) restricting access to the materials and the testimony regarding the materials to the most limited audience possible, preferably only to individuals who satisfy NCS Pearson's qualification policy; (b) restricting copying of the test materials; (c) requiring the inclusion of an appropriate restrictive legend on the produced materials indicating that the test materials are subject to specified terms of the identified protective order and may be used solely for limited purposes in connection with the specified case; (d) requiring return or destruction of the materials at the conclusion of the proceeding . . . and (e) sealing the record to the extent any portion of such materials are disclosed in pleadings, testimony or other documents."

Harcourt made the same recommendation, using remarkably similar verbiage: "Therefore, if the disclosure of test materials is deemed necessary by the judge, Harcourt respectfully requests that the court issue a protective order governing the use and access to such materials which: (a) restricts access to the materials and any testimony regarding the materials to the most limited audience possible, preferably only to counsel and experts engaged by the parties who are professionally qualified to use and interpret the tests; (b) restricts use of the test materials only to that required for the resolution of the pending proceeding; (c) at the conclusion of the proceeding, requires the prompt return of the materials produced and the destruction of any copies made . . . and (d) seals the record . . . to the extent any portion of such materials are disclosed in pleadings, testimony, exhibits or other documents which would otherwise be available for public inspection."

Thus, Pearson and Harcourt have indicated a means by which a copy of the copyrighted tests *could* be provided without violation of copyright law or harm to the secrecy, validity and integrity of the tests.

### 2. *Examiner's Ethical Obligations as to Disclosure of Questions and Answers*

In its opposition to Carpenter's writ petition, Yamaha also claims that disclosure of the test questions—and Carpenter's answers—would run afoul

of the examiner's ethical and professional obligations. In this regard, Yamaha refers us to the "Standards for Educational and Psychological Testing," prepared by the American Psychological Association and other organizations. Standard 5.7 states that those who have test materials under their control are responsible for protecting the security of those materials.[12] Standard 11.8 provides that psychologists have an obligation not to reproduce copyrighted materials—such as "test items, ancillary forms such as answer sheets or profile forms, scoring templates, conversion tables of raw scores to derived scores, and tables of norms"—for "routine test use without consent of the copyright holder."

Yamaha did not present this material to the trial court, perhaps because Carpenter had not requested copies of the tests and answers until his opposition to the motion to compel. Because we are remanding the matter for the trial court to decide the issue anew, the court may consider at that time the parties' arguments regarding the examiner's ethical and professional obligations.

### 3. *Further Consideration by the Trial Court*

Based on the record before it, the trial court erred in concluding that the written test questions could not be provided to Carpenter due to copyright law. It is unclear whether the court would have denied production of the written test questions absent this conclusion. For example—and without expressing our view on the matter—the trial court might conclude it sufficient to give Carpenter the names of the tests and the ability to audiotape the session (including the written test questions and his answers); on the other hand, the court might conclude that having Carpenter read the questions and answers aloud during the test would present an undue burden, or unduly prolong or interfere with the examination. We leave this matter, as well as the issue of providing Carpenter with a copy of his test answers, to the trial court's sound discretion.[13]

---

[12] The comment to standard 5.7 reads as follows: "Those who have test materials under their control should, with due consideration of ethical and legal requirements, take all steps necessary to assure that only individuals with a legitimate need for access to test materials are able to obtain such access before the test administration, and afterwards as well, if any part of the test will be reused at a later time. Test users must balance test security with the rights of all test takers and test users. When sensitive test documents are challenged, it may be appropriate to employ an independent third party, using a closely supervised secure procedure to conduct a review of the relevant materials. Such secure procedures are usually preferable to placing tests, manuals, and an examinee's test responsibilities in the public record."

[13] The written tests are standardized and available to those who meet the publishers' criteria. Once the plaintiff's psychologist knows the name of the test, the psychologist would be able to obtain a copy of the questions, if he does not already have them in his possession. Based on the record before us, therefore, there is little need for Carpenter to obtain a copy of the test

## III. *DISPOSITION*

The order to show cause, having served its purpose, is discharged, and the petition is granted. Let a peremptory writ of mandate issue, directing the trial court to vacate its order granting the mental examination of Carpenter, and to enter a new and different order consistent with the views expressed in this opinion. The stay of proceedings in the trial court is dissolved upon the finality of this decision in this court (Cal. Rules of Court, rule 24(b)(1)). Petitioner shall recover his costs.

Simons, Acting P. J., and Gemello, J., concurred.

---

from Yamaha, and little reason for Yamaha to withhold a copy of the test from Carpenter, particularly given the widespread use of protective orders espoused by the tests' publishers.