Filed 4/26/23; Certified for Publication 5/18/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| RANDY'S TRUCKING, INC., et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>ANGELA BUTTRAM et al.,<br><br>Real Parties in Interest. | F084849<br><br>(Super. Ct. No. BCV-20-100982)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of mandate. Bernard C. Barmann, Judge.

Haight Brown & Bonesteel LLP, Arezoo Jamshidi, Kaitlyn A. Jensen, Krsto Mijanovic, Elizabeth Rhodes, and Steven Scordalakis for Petitioner.

Artiano Shinoff and Paul V. Carelli IV for Amici Curiae American Academy of Clinical Neuropsychology and Inter Organizational Practice Committee on behalf of Petitioners.

Law Offices of Ryan Connolly and Ryan Connolly for Amicus Curiae Manson Western, Inc., on behalf of Petitioners.

Carlton Fields, LLP and Stephanie G. Chau for Amicus Curiae Psychological Assessment Resources, Inc., on behalf of Petitioners.

No appearance for Respondent.

Vaziri Law Group, Siamak Vaziri, David Shay, and Mark J. Nagle for Real Parties in Interest.

-ooOoo-

This lawsuit arises from a motor vehicle accident which Angela Buttram alleges occurred when a tractor-trailer rear-ended the school bus she was driving. Buttram and Devon Robbins, a passenger on the school bus (collectively, plaintiffs), sued Blaine Fields, the tractor-trailer driver, and his employer, Randy's Trucking, Inc. (collectively, defendants), alleging personal injuries and emotional distress from the accident.

During discovery, Buttram claimed she suffered a severe traumatic brain injury due to the accident, and her associated symptoms prevented her from returning to work. Consequently, defendants filed a motion for an order compelling Buttram to undergo a mental examination by their neuropsychologist after plaintiffs refused to allow the examination to proceed unless their attorney received all raw data and test information from the examination. Defendants asked the trial court to prohibit the provision of raw test data, test materials, copyrighted publications, or documents containing proprietary information to anyone other than a licensed psychologist or neuropsychologist. While the trial court granted the motion to compel the examination, it denied defendants' request to limit transmission of the test data and materials to a licensed psychologist or neuropsychologist; instead, the court ordered defendants' neuropsychologist to transfer raw data and an audio recording of the examination to plaintiffs' attorney subject to a protective order (the transmission order).

2.

Defendants' chosen neuropsychologist recused herself, stating she could not comply with the transmission order because doing so would compromise the security of the tests and cause her to violate her professional and ethical duties. After defendants contacted two other neuropsychologists who stated they also could not comply with the transmission order, defendants moved for reconsideration of the transmission order. The trial court denied the motion.

Defendants filed a petition for writ of mandate in this court to challenge the transmission order and the denial of their motion for reconsideration, arguing the trial court abused its discretion. Defendants ask us to direct the trial court to either modify the transmission order to require the transmission of the raw data and audio recording to plaintiffs' retained psychologist or neuropsychologist rather than plaintiffs' attorney, or vacate the order denying the motion for reconsideration and enter a new order granting the motion.

We issued an order to show cause and stayed further proceedings in the trial court pending this decision. Plaintiffs filed a return and demurrer to the petition, and defendants filed a reply. Amicus curiae briefs were also filed in support of plaintiffs from two professional organizations—the American Academy of Clinical Neuropsychology (AACN) and the Inter Organizational Practice Committee (IOPC)—and two publishers of psychological tests—Manson Western, Inc., and Psychological Assessment Resources, Inc. (PAR). Finding no abuse of discretion, we deny writ relief.

**FACTUAL AND PROCEDURAL BACKGROUND**

Based on Buttram's claim that she suffered a traumatic brain injury, defendants sought to have Buttram submit to a mental examination by a neuropsychologist of their choosing, Tara Victor, Ph.D. The parties, however, could not agree on the ground rules for Dr. Victor's examination. Plaintiffs' counsel refused to stipulate to the examination unless the examining neuropsychologist provided them with all testing materials, raw test data, and an audio recording of the examination. Defendants, however, maintained

3.

Dr. Victor was unwilling to transfer those items to plaintiffs' counsel, although she would provide them to a similarly situated expert who was subject to the same professional and ethical duties to which she was subject.

*The Motion for a Neuropsychological Exam*

Defendants moved for an order granting leave to conduct a neuropsychological examination of Buttram pursuant to Code of Civil Procedure section 2032.310,[1] without having to provide raw data and copyrighted examination questions to plaintiffs' counsel. Defendants asserted requiring such a disclosure would cause Dr. Victor to violate her ethical and professional duties as a licensed neuropsychologist, and the raw data and examination questions were of no use to plaintiffs' counsel "other than to utilize it improperly to corrupt the process by preparing future clients using the copyrighted questions." Defendants asked the court to order the transfer of data to plaintiffs' retained neuropsychologist, "whoever that is," as plaintiffs needed such an expert to prove Buttram's claim.

In Dr. Victor's declaration accompanying the motion, Dr. Victor explained the parameters of the examination and listed the tests she may administer. As pertinent here, Dr. Victor stated "[n]o raw test data, test materials, copyrighted publications, or documents containing proprietary information will be provided to anyone who is not a licensed psychologist," and she would only provide those items to "opposing counsel's retained licensed psychologist expert." Dr. Victor would agree to audio recording of the clinical interview under specified conditions, which included sending a copy of the recording only to the plaintiffs' retained licensed psychology expert.

Dr. Victor stated she would not permit third party observation (TPO) while administering neuropsychological and psychological tests. She explained why she was concerned about TPO, which included: (1) public exposure of test materials

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

4.

compromises the validity of future neuropsychological test results, as examinees must be naïve to general test demands and test content; (2) "TPO leads to potential misuse and misinterpretation of tests by untrained TPOs" who do not have a compelling interest in protecting copyrighted test content, whereas psychologists "are ethically bound to protect the security and integrity of test materials and are appropriately trained in administration and interpretation of complex results"; and (3) "TPO increases the likelihood that test content and instructions will be disseminated, which in turn raises the risk that motivated parties will coach and prepare examinees for testing in advance, specifically to influence test results."  Dr. Victor asserted the presence of a TPO could conflict with numerous ethical standards set forth in the American Psychological Association (APA)'s "Ethical Principles of Psychologists and Code of Conduct" (APA Ethical Standards), as well as with "several key principles" in the APA's "Specialty Guidelines for Forensic Psychology."

In opposing the motion, plaintiffs asserted they only were seeking to have the raw data from the examination provided to their counsel in addition to plaintiffs' expert. Plaintiffs' counsel offered to sign a protective order making the data available for use only in this case and only for review by counsel's team and experts, with the data to be destroyed at the conclusion of the case, which would be in addition to counsel's duty of confidentiality to Buttram.  Plaintiffs asserted *Carpenter v. Superior Court* (2006) 141 Cal.App.4th 249 (*Carpenter*) supported providing such materials to counsel subject to a protective order.  Plaintiffs also asserted they had a right to an audio recording of the full examination, including cognitive testing, as they had "a right to ensure that the examiner does not overstep his bounds during the examination, and since Plaintiff's counsel cannot be present for it, a full audio recording in addition to the other listed safeguards, is the only way to protect that right."

Plaintiffs pointed out Standard 9.04 of the APA Ethical Standards provides that a patient may authorize the release of raw test data to the patient or other persons identified

5.

in the release, and Standard 9.11 of the APA Ethical Standards "only requires that psychologists make 'reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations.' " Plaintiffs claimed the proposal to release the materials to their counsel subject to a protective order regarding use of the materials satisfied Standard 9.11, as plaintiffs' counsel has an ethical obligation not to disclose a client's medically private information, and the protective order would limit the use of the materials to this case and guarantee their destruction at the end of the required retention period. Plaintiffs argued with the protective order in place, California Code of Regulations, title 16, section 1396.3[2] supports a ruling that the raw data and test recordings may be released to Buttram and her counsel, as plaintiffs' counsel are " 'persons with interests who will safeguard their use.' "

In reply, defendants argued plaintiffs did not show good cause to require Dr. Victor to transfer her raw data and testing materials to plaintiffs' counsel rather than plaintiffs' parallel expert. Defendants asserted *Carpenter* does not hold plaintiffs are entitled to compel transfer of privileged data and testing materials to plaintiffs' counsel without good cause. Defendants contended ordering the transfer of raw data to plaintiffs' counsel would violate Dr. Victor's duties under regulation 1396.3 and California Code of Regulations, title 16, section 1881(*l*),[3] and plaintiffs had not shown why Dr. Victor

---

[2]     California Code of Regulations, title 16, section 1396.3 provides: "A psychologist shall not reproduce or describe in public or in publications subject to general public distribution any psychological tests or other assessment devices, the value of which depends in whole or in part on the naivete of the subject, in ways that might invalidate the techniques; and shall limit access to such tests or devices to persons with professional interests who will safeguard their use." Section 1396.3, which is part of the Psychology Regulations (Cal. Code Regs., tit. 16, § 1380, et seq.), is hereafter referred to as regulation 1396.3.

[3]     California Code of Regulations, title 16, section 1881 lists conduct that constitutes unprofessional conduct for licensed clinical social workers as used in Business and Professions Code section 4992.3. California Code of Regulations, title 16,

6.

should be required to violate her professional and legal duties, particularly where defendants have offered to transfer the privileged data to plaintiffs' expert.

After hearing oral argument on defendants' motion,[4] the trial court issued a written order granting the motion. The order authorized Dr. Victor to perform a neuropsychological examination of Buttram and set the parameters for the examination. As pertinent here, the order prohibited any videotaping or TPO of the examination but ordered Dr. Victor or a technician from her office (who would not be present during the examination) to audio record the examination. The transmission order required the audio recording, a copy of Dr. Victor's report, and "all raw data" be provided to Buttram's counsel within 30 days of the examination, which was subject to a protective order.

The protective order provided: "Plaintiff's counsel, defense counsel and all experts, consultants and employees of the respective firms shall maintain the security of all raw data, test materials and other medically private information obtained during the examination. However, such raw data, test materials and other medically private information may be disclosed to plaintiff's counsel, defense counsel and all experts, consultants and employees of the respective firms for use in this case. Such materials and data may also be shown to the trier of fact at the time of trial, or such other time as may be necessary for the adjudication of the above-captioned matter. These materials may be

section 1881(*l*) provides that unprofessional conduct includes: "Reproduces or describes in public or in publications subject to general public distribution, any psychological test or other assessment device, the value of which depends in whole or in part on the naivete of the subject, in ways that might invalidate such test or device. The licensee shall limit access to such test or device to persons with professional interest who are expected to safeguard their use." Section 1881(*l*) of title 16 of the California Code of Regulations is hereafter referred to as regulation 1881(*l*).

[4]    Defendants submitted their attorney's declaration with the petition in which she stated the hearing was not reported because a court reporter was not present due to a misunderstanding by her office. Pursuant to California Rules of Court, rule 8.486(b)(3)(A), defendants' attorney provided a summary of the hearing to the best of her recollection.

used for no other purpose, may not be disseminated to any other party and the parties shall take all reasonable steps to maintain the confidentiality of the above-identified materials." The order further required the parties to "destroy the above-identified materials at the cessation of this case, in accordance with the provisions of the California Rules of Professional Conduct."

### *The Motion for Reconsideration*

After reviewing the transmission order's requirements for transferring raw data and an audio recording of the formal testing portion of the exam to plaintiffs' counsel and others not licensed in the field of psychology, Dr. Victor recused herself from the case, telling defendants' counsel that she had "considered all possible alternatives" but given the order's requirements, there was "no way for [her] to proceed with the examination while remaining within the ethical bounds of [her] profession."

Defendants' counsel subsequently contacted two neuropsychologists about the order. Kyle Boone, Ph.D., told counsel she "could not and would not comply with the Order as it required her to violate the legal, ethical and professional obligations of her license as a psychologist." Lori Holt, Ph.D., who worked with another licensed neuropsychologist, Jeffrey Schaeffer, Ph.D., told counsel that "no licensed neuropsychologist could comply with the Order as written."

Defendants moved for reconsideration of the transmission order. Defendants asked the trial court to amend the order to require transfer of "all testing materials, raw data, and the audio recording of the testing portion" of Buttram's examination to any licensed neuropsychological expert plaintiffs' counsel may retain. Defendants asserted as new facts and circumstances that Dr. Victor had recused herself from the case, and neither Dr. Victor nor any licensed examiner in the field of neuropsychology could comply with the order as written, which left defendants without the means to defend Buttram's claim she suffered a severe traumatic brain injury.

Defendants asked the trial court to take judicial notice of a January 2022 position paper from the AACN pertaining to test security. Defendants asserted the AACN position paper discussed the potential consequences if testing materials become publicly available, such as test takers attempting to sway test results to obtain a certain outcome, and AACN's concern that if examinees in civil and criminal litigation become aware of psychometric procedures used to determine symptom severity and validity, they could adjust their test performances to reflect more severe psychological and cognitive function.

Defendants asserted no psychologist would agree to perform a mental exam if they must break their contractual obligation with test vendors to maintain the confidentiality of test materials and violate the "clear ethical standards they are required to comply with in their medical fields." Defendants claimed they did not have any expert or potential expert who would comply with the order. Defendants' counsel related her conversations with Drs. Boone and Holt in a declaration, and asserted she knew Dr. Schaeffer's office uses a specific set of requirements that state no testing materials, raw data, or audio recording of the testing period of a neuropsychological examination may be transferred to anyone other than a similarly licensed psychologist on the opposing side when an exam is given for litigation purposes.

Plaintiffs opposed the motion for reconsideration, arguing it did not present new facts or new law. Plaintiffs asserted the factual grounds for the motion—that Dr. Victor recused herself and another expert could not be found after a few phone calls—were not new, as defendants claimed Dr. Victor would not comply with the order when bringing the original motion. Plaintiffs further asserted it was not accurate that defendants could not retain a neuropsychologist, claiming nearly every judge in the Kern County civil

bench had issued "[n]early identical orders" that had been complied with, three of which were attached to plaintiff's counsel's declaration.[5]

In reply, defendants asserted they were moving for reconsideration based on new facts and circumstances that arose after the court issued its order—that the defense lost its expert due to the order and was unable to locate an expert who would comply with the order. Defendants asserted if the court did not modify the transmission order, access to testing materials would permit plaintiffs' counsel to coach Buttram and attempt to destroy the validity of the test and force any expert plaintiffs may retain to violate his or her ethical and legal duties as a neuropsychologist or psychologist.

Defendants also asserted the court orders from other cases that plaintiffs provided with their opposition were not what they seemed. Defendants provided declarations from two neuropsychologists who were ordered to disclose testing data and materials to the plaintiff's attorneys in the earlier cases, Jeffrey M. Lulow, Ph.D.,[6] and Howard J. Friedman, Ph.D. Both doctors declared that they felt they had no choice but to comply with the court's orders, but they "did so under duress, as [they were] being forced and [were] forced to violate [their] ethical and legal obligations not to disclose secured testing

---

[5]     The orders were issued by three different judges on the Kern County Superior Court. In ordering mental health examinations, two orders required "raw data" be provided to the plaintiffs' attorneys, while the third required the transmission of "raw test data, including test pages, and test results" to the plaintiffs' attorneys. Two of the orders allowed audio recording of the examination, which was to be provided to the plaintiffs' attorneys, and contained protective orders that mirror the one at issue here. The neuropsychologists subject to the orders were Drs. Philip Stenquist, Jeffrey M. Lulow, and Howard J. Friedman.

[6]     In a January 2017 declaration filed in the earlier case, Dr. Ludlow stated the plaintiff's attorney wanted raw data from his examination of the plaintiff; he told the attorney he would provide a report after the examination that would either list test scores or describe the plaintiff's responses; and in an effort to adhere to his ethical and legal obligations, he offered to either provide the materials to the plaintiff's expert neuropsychologist or have plaintiff's counsel sign a statement, which he had used for 20 years, that counsel would maintain test security.

materials, and raw data, and recordings of the administrations of those tests, to a non-licensed, non-professional," namely, the plaintiff's attorneys. Dr. Lulow stated he eventually agreed to provide the protected materials to the plaintiff's attorney with the understanding the attorney would transmit the materials to the plaintiff's retained neuropsychologist, Jeffrey Schaeffer, Ph.D., because the court ordered him to do so. Both doctors emphasized they complied with the court order because they believed they had no choice, but they strongly objected and continued "to object to the forced violation of [their] ethical and legal duties" as neuropsychologists.

At oral argument on the motion for reconsideration, the trial court first announced its tentative ruling. As applicable here, the trial court noted defendants identified three things as new or different facts, circumstances, or law: (1) Dr. Victor's withdrawal because she could not comply with the court's order; (2) the two other doctors they contacted who could not comply; and (3) some case law cited in the motion. The trial court found the case law was not new, but with respect to Dr. Victor and the others not being able to comply with the examination order, the trial court stated AACN's official position paper on test security suggested that when faced with a judicial order, the practitioner "can choose to withdraw from the case and can also opt to document through canvassing of other local neuropsychologists that the broader neuropsychology community refuses to conduct exams under invasive parameters that threaten the validity of the assessment process." The trial court noted defendants only pointed to two additional experts who refused to do the examination under the existing order which, in its view, was "hardly a canvas and so the court, at this point, is inclined to deny this motion." After considering the arguments of counsel, the trial court was satisfied the tentative ruling was correct and denied the motion, adding that it was not inclined to issue advisory rulings on any future orders it might make.

11.

**DISCUSSION**

**I.** *Scope of Relief in Mandate and Standard of Review*

A writ of mandate may be issued to compel an inferior court to perform an act "which the law specifically enjoins, as a duty resulting from an office, trust, or station…." (§ 1085, subd. (a).) "Generally, a writ [of mandate] will lie when there is no plain, speedy, and adequate alternative remedy; the respondent has a duty to perform; and the petitioner has a clear and beneficial right to performance." (*Payne v. Superior Court* (1976) 17 Cal.3d 908, 925.) " 'Although mandamus does not generally lie to control the exercise of judicial discretion, the writ will issue "where, under the facts, that discretion can be exercised in only one way." ' " (*Diaz-Barba v. Superior Court* (2015) 236 Cal.App.4th 1470, 1483, citing *Robbins v. Superior Court* (1985) 38 Cal.3d 199, 205.)

Writ review of discovery rulings is generally disfavored. (*O'Grady v. Superior Court* (2006) 139 Cal.App.4th 1423, 1439.) "Interlocutory writ review of discovery rulings [by extraordinary writ proceedings] is ordinarily limited to situations involving (1) an issue of first impression that is of general importance to the legal profession, (2) an order denying discovery that effectively precludes a litigant from having a fair opportunity to litigate his or her case, or (3) a ruling compelling discovery that violates a privilege." (*City of Petaluma v. Superior Court* (2016) 248 Cal.App.4th 1023, 1031.)

" 'The standard of review generally applicable to review of discovery orders is abuse of discretion, as management of discovery lies within the sound discretion of the trial court. [Citations.]' [Citation.] 'In particular, the abuse of discretion standard of review ordinarily applies to review of an order on a motion to compel discovery [citation].' " (*Haniff v. Superior Court* (2017) 9 Cal.App.5th 191, 198.) "We apply the independent standard of review to the purely legal question of statutory interpretation. [Citation.] Thus, 'where the propriety of a discovery order turns on statutory interpretation, an appellate court may determine the issue de novo as a question of law.' "

12.

(*Manuel v. Superior Court* (2022) 82 Cal.App.5th 719, 727.)  We also review a trial court's ruling on a motion for reconsideration for abuse of discretion.  (*Glade v. Glade* (1995) 38 Cal.App.4th 1441, 1457.)

"[I]t is generally accepted that the appropriate test of abuse of discretion is whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered."  (*Rappleyea v. Campbell* (1994) 8 Cal.4th 975, 987.)  "However, 'all exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue.' "  (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15.)  "Therefore, a discretionary decision may be reversed if improper criteria were applied or incorrect legal assumptions were made."  (*Ibid.*)

## II.     *The Motion for a Mental Examination*

In moving for a neuropsychological examination of Buttram, defendants asked the trial court to order Dr. Victor to transfer the testing information to plaintiffs' expert rather than plaintiffs' counsel.  The trial court denied that request and instead ordered Dr. Victor to provide an unedited and unaltered audio recording of the examination and "all raw data" to plaintiffs' counsel within 30 days after the examination subject to a protective order.  The protective order allows disclosure of "raw data, test materials and other medically private information obtained during the examination" to plaintiffs' counsel, defendants' counsel, and "all experts, consultants and employees of the respective firms for use in this case," and further allows these materials and data to be shown to the trier of fact at trial or when necessary for adjudication of the case.  The protective order requires plaintiffs' and defendants' counsel, as well as all experts, consultants, and employees of their firms, to maintain the security of the materials and data and "take all reasonable steps to maintain the confidentiality" of the described materials, which must be "used for no other purpose" and must not be disseminated to any other party.  Finally,

13.

the protective order requires the parties to destroy the materials at the cessation of the case in accordance with the California Rules of Professional Conduct.

Defendants argue: (1) the trial court erred in ordering the examining neuropsychologist to transfer the raw data and audio recording to anyone but another licensed psychologist or neuropsychologist because the statute governing mental examinations does not authorize the examinee to request such materials from the examining party; and (2) even if the trial court has discretion to order the transfer of such materials to plaintiffs' attorney and provide access to other nonexperts, the trial court abused its discretion in so ordering.[7]

## A.     The Authority to Order Disclosure of Test Materials and Data

A defendant generally may obtain a mental examination of a plaintiff if the plaintiff has placed his or her mental condition in controversy. (§ 2032.020, subd. (a).) To obtain discovery by a mental examination, the defendant must seek leave of court, with the motion specifying "the time, place, manner, conditions, scope, and nature of the examination, as well as the identity and the specialty, if any, of the person or persons who will perform the examination." (§ 2032.310, subds. (a) & (b).)

The court may order the mental examination only on a showing of good cause. (§ 2032.320, subd. (a).) Its order granting the examination must specify certain details of the examination, including "the person or persons who may perform the examination, as well as the time, place, manner, diagnostic tests and procedures, conditions, scope, and nature of the examination." (*Id.*, subd. (d).) Both the examiner and examinee "have the right to record a mental examination by audio technology." (§ 2032.530.) If a party

---

[7]     Defendants assert the trial court ordered the transmission of "all testing materials, raw test data and a full audio recording of the examination" to plaintiffs' attorney. The trial court's transmission order, however, only provides for the transmission of "all raw data" and an audio recording of the examination. While the transmission order does not state that the testing materials must be transmitted, an audio recording would record verbally given test materials and data.

14.

submits to a mental examination, "that party has the option of making a written demand that the party" seeking the examination deliver to the demanding party "[a] copy of a detailed written report setting out the history, examinations, findings, including the results of all tests made, diagnoses, prognoses, and conclusions of the examiner." (§ 2032.610, subd. (a)(1).)[8] If the option is exercised, a copy of the requested reports must "be delivered within 30 days after service of the demand, or within 15 days of trial, whichever is earlier." (*Id.*, subd. (b).)

Defendants contend the trial court erred in ordering transmission of the raw data and audio recording to plaintiffs' counsel because those items are not among the materials listed under the demand provided in section 2032.610, subdivision (a). Defendants contend that because testing materials, raw test data, and an audio recording of the examination are not listed in the statute, plaintiffs could not demand the production of those items and the trial court could not order them transmitted to plaintiffs' attorney.

There is no statutory authority, however, precluding a trial court from ordering the disclosure of test materials or test data when ordering a mental examination. (*Carpenter*, *supra*, 141 Cal.App.4th at p. 271.) In *Carpenter*, the trial court granted the defendant's motion to compel the plaintiff's mental examination and ordered that the plaintiff could audiotape the examination and read the written questions onto the tape but refused to order production of the written test questions due to copyright law. (*Ibid.*) In his petition for writ review, the plaintiff maintained he was entitled to copies of the written test materials and his answers because the statute governing mental examinations allows an

---

**8** Section 2032.610 provides, in pertinent part: "If a party submits to … [a] mental examination in compliance with … an order of court under Article 3 (commencing with Section 2032.310), … that party has the option of making a written demand that the party at whose instance the examination was made deliver both of the following to the demanding party: [¶] (1) A copy of a detailed written report setting out the history, examinations, findings, including the results of all tests made, diagnoses, prognoses, and conclusions of the examiner. [¶] (2) A copy of reports of all earlier examinations of the same condition of the examinee made by that or any other examiner."

audio recording. (*Ibid*.) The appellate court rejected that argument, explaining: "The fact that section 2032.530 permits the mental examination to be *audio*taped, however, does not provide statutory authority for compelling the examiner to provide a copy of the written test questions and answers." (*Ibid*.)

The appellate court nevertheless recognized that "[w]hile there is no express statutory authority" for the plaintiff's position, "neither is there statutory authority precluding a trial court, in its discretion, from ordering the disclosure of the written test questions and answers." (*Carpenter*, *supra*, 141 Cal.App.4th at p. 271, citing *Golfland Entertainment Centers, Inc. v. Superior Court* (2003) 108 Cal.App.4th 739, 747 (*Golfland*).) The plaintiff argued the discretion to disclose the materials should be exercised because he could not meaningfully exercise his rights to take discovery of and cross-examine the defendant's expert witnesses without the test questions and answers on which the experts' opinions are based, citing section 2034.410 and Evidence Code section 721, subdivision (a). (*Carpenter*, at pp. 271–272.) The plaintiff further argued the disclosure of these materials would protect against abuse and subsequent disputes over what occurred. (*Id.* at p. 272.)

The appellate court recognized resolution of this issue was within the trial court's discretion, but the trial court's decision to deny access to the written test questions was based on an erroneous conclusion regarding copyright law. (*Carpenter*, *supra*, 141 Cal.App.4th at p. 272.) The appellate court found the evidence before the trial court was insufficient to support the finding that providing a copy of the tests would be a copyright infringement, as the evidence did not indicate which test the examiner would use, the terms by which the examiner came into possession of the tests, or any limitations on their disclosure. (*Id.* at p. 273.) Moreover, "[e]ven if it could be presumed that all 'written standardized tests' evaluating emotional and cognitive functioning were subject to copyright protection, it was not established that providing a copy of the test questions,

after an examination and by court order, would violate copyright law in every instance." (*Ibid.*)[9]

The defendant also claimed disclosure of the test questions and the plaintiff's answers would violate the examiner's ethical and professional obligations, referring to the APA Ethical Standards. (*Carpenter*, *supra*, 141 Cal.App.4th at pp. 274–275.) The appellate court declined to decide this issue, however, as the material had not been presented to the trial court and since it was "remanding the matter for the trial court to decide the issue anew, the court may consider at that time the parties' arguments regarding the examiner's ethical and professional obligations." (*Id.* at p. 275.)

While *Carpenter* did not decide whether the examiner's ethical and professional obligations precluded disclosing the test questions and the examinee's answers to the examinee, the appellate court recognized the trial court has discretion to order the disclosure of such materials even if no statute authorizes it. (*Carpenter*, *supra*, 141 Cal.App.4th at p. 271.) While the *Carpenter* court did not specifically analyze section 2032.610 in making its observation, given the trial court's broad discretion in discovery matters, the trial court nevertheless has the power to order disclosure of test materials and data to plaintiff's attorney. (See *Vinson v. Superior Court* (1987) 43 Cal.3d 833, 846 [trial courts, which have "broad discretion in discovery matters," retain the power to take prophylactic measures].)

---

[9]    For the benefit of the trial court and parties on remand, the appellate court considered material the defendant presented on the writ that were from two copyright holders concerning certain standardized psychological tests. (*Carpenter*, *supra*, 141 Cal.App.4th at p. 273.) The appellate court noted in those materials, both copyright holders suggested a satisfactory way to provide the tests after the mental examination— the test questions and answers could be given to plaintiff's counsel or a designated psychologist, "subject to a protective order strictly limiting the use and further disclosure of the material, and providing for other safeguards against access that would compromise the integrity and validity of the tests." (*Id.* at p. 274.)

Defendants assert *Roe v. Superior Court* (2015) 243 Cal.App.4th 138 (*Roe*) is instructive on this issue. There, in opposition to a motion to compel the mental examination of the minor plaintiff, the plaintiffs sought to compel the defendants to produce copies of the written test questions and the minor's responses. (*Id.* at p. 146.) While the trial court ordered the examiners to provide the reports statutorily required by section 2032.610, it specified the plaintiffs were not entitled to the written testing materials and the minor's answers without further court order. (*Roe*, at p. 147.)

On writ review, the plaintiffs sought to compel the defendants to deliver the written tests and test answers. The appellate court rejected the plaintiffs' argument that section 2032.610, subdivision (a)(1), requires the production of the test materials by analogy to a criminal discovery statute, Penal Code section 1054.3, subdivision (a)(1), since the plaintiffs did not show the Legislature's intent and purpose regarding section 2032.610, subdivision (a)(1) supported their argument. (*Roe*, *supra*, 243 Cal.App.4th at pp. 147–148.) The appellate court stated that while the plaintiffs also argued "section 2032.610's phrase 'results of all tests made' constitutes 'plain language' " requiring the minor's answers be provided to him, they did not offer any support for the assertion.[10] (*Roe*, *supra*, 243 Cal.App.4th at p. 148.)

The appellate court concluded that because the plaintiffs' "undeveloped analyses fail[ed] to establish that section 2032.610 requires [the] defendants to deliver the written testing materials and [the minor]'s raw answers to [the] plaintiffs," the plaintiffs did not demonstrate "the [trial] court was under a legal duty to order, or that its discretion could be legally exercised only by ordering, such delivery." (*Roe*, *supra*, 243 Cal.App.4th at p. 149.) The appellate court further concluded the plaintiffs had not demonstrated there

---

[10] The appellate court noted the statute's plain language did not "resolve whether test 'results' encompasses the examinee's raw responses," as "[t]he word 'result' generally refers to the consequence or outcome of something." (*Roe*, *supra*, 243 Cal.App.4th at pp. 148–149, fn. 6.)

was no plain, speedy, and adequate remedy available to them, as (1) the trial court's order suggested they could request a further court order as to the written testing materials and the minor's answers, (2) if they did not receive reports satisfying section 2032.610, subdivision (a), they had a statutory right to bring a motion to compel delivery of the reports, and (3) they had the right to appeal from a final judgment. (*Roe*, at p. 149.) The appellate court therefore determined no writ relief was warranted. (*Ibid.*)

At best, *Roe* stands for the proposition that a trial court is not *required* to order the production of test materials or test data under section 2032.610. Under *Carpenter*, however, given the trial court's broad discretion in discovery matters, it retains the discretion to order the production of such materials. Moreover, although not developed by either party, since section 2032.530, subdivision (a) grants the examinee the right to record a mental examination by audio technology, it implies the examinee may retain a copy of the audio recording. Where, as here, the trial court ordered the examiner to record the examination, the trial court had discretion to order the examiner to provide a copy to the examinee. Therefore, we conclude the trial court here had the discretion to order the production of the raw data and audio recording, as stated in its order.

## B.     The Trial Court Did Not Abuse Its Discretion

The issue then is whether the trial court abused its discretion in ordering transmission of the raw data and audio recording to plaintiffs' counsel. Defendants contend it did because plaintiffs' need for these materials is outweighed by the need to protect Dr. Victor from violating her ethical and professional obligations.

The only evidence on this issue that was before the trial court was Dr. Victor's declaration on the "nature, scope and conditions of the proposed neuropsychological examination." Dr. Victor stated she would agree to audio recording of clinical interviews only if she recorded the interview herself and sent a copy to the plaintiffs' licensed psychology expert, and she would only provide "raw test data, test materials, copyrighted

19.

publications, or documents containing proprietary information" to a licensed psychologist.

Dr. Victor explained the problems with TPO and recording the examination, including: (1) compromising the validity of future neuropsychological test results; (2) potential misuse and misinterpretation of tests by untrained TPOs "who have no compelling interest in protection of copyrighted test content"; (3) potential conflicts with the APA Ethical Standards and "several key principles in the Specialty Guidelines for Forensic Psychology of the American Psychological Association (2013)"; (4) the increased likelihood test content and instructions would be disseminated which "raises the risk that motivated parties will coach and prepare examinees for testing in advance, specifically to influence test results"; and (5) " '[l]awyers involved in brain injury litigation routinely coach their clients how to approach neuropsychological testing to their advantage.' " Dr. Victor asserted TPO "confers no overriding benefits that offset the significant costs of exposing test materials."

While Dr. Victor explained the dangers associated with TPO, she did not explain why a protective order would not ameliorate those dangers. She also did not explain why her ethical obligations would be violated if a court ordered her to disclose the raw data and audio recording to plaintiffs' attorney subject to a protective order. Dr. Victor identified numerous standards in the APA Ethical Standards by number which she claimed could be violated if TPO were allowed, but Dr. Victor did not explain the potential violations and the APA Ethical Standards were not submitted to the trial court.

Weighed against this evidence is plaintiffs' right to take discovery and cross-examine defendants' expert witnesses, which includes being able to examine the expert on the matter upon which the expert's opinion is based and the reasons for that opinion. (Evid. Code, § 721, subd. (a).) Without the raw data and audio recording, plaintiffs cannot effectively scrutinize the way the data was collected, determine if there are

discrepancies, and cross-examine the neuropsychologist on the basis and reasons for the neuropsychologist's opinion.

While defendants assert plaintiffs' attorneys could not interpret the test materials, they would not necessarily be required to do so to use the materials for purposes of cross-examination, since disclosure of these materials may help to protect against abuse and disputes over what transpired during the examination. As the court explained in *Golfland*, the purpose of audiotaping the examination is "to ensure that the examiner does not overstep the bounds set by the court for the mental examination, that the context of the responses can be judged for purposes of trial, that the examinee's interests are protected (especially since the examinee's counsel ordinarily will not be present), and that any evidence of abuse can be presented to the court." (*Golfland*, *supra*, 108 Cal.App.4th at p. 750.) Without plaintiffs' access to the audiotape and raw data, plaintiffs cannot adequately protect these interests.

Defendants argue it is sufficient to transmit the raw data and audio recording to plaintiffs' retained expert. But as plaintiffs assert, they should not be forced to retain an expert to gain access to these materials and even if they do retain one, that expert can only assist the attorney in preparing for cross-examination; to prepare and conduct an effective cross-examination, "the attorney must themselves possess more than a second-hand understanding of the information being scrutinized."

Based on the record before it, the trial court reasonably could find plaintiffs had a legitimate need for the raw data and audio recording and the concerns about maintaining test security would be satisfied with a protective order. While defendants assert Dr. Victor stated she would violate her professional and ethical obligations if she transferred the raw data and audio recording to plaintiffs' attorney, Dr. Victor did not state that those obligations would be violated if a protective order were issued.

Defendants assert both California and federal law require protection of test materials. As for California law, defendants cite regulation 1396.3, which prohibits a

psychologist from producing or describing "in public or in publications subject to general public distribution" certain psychological tests or other assessment devices and requires the psychologist to "limit access to such tests or devices to persons with professional interests who will safeguard their use." While this regulation requires psychologists to maintain test security, it does not address a psychologist's duty when a court order requires an attorney's access to psychological tests or devices, particularly subject to a protective order that requires the parties to safeguard the use of the tests or devices. Put another way, the regulation does not prohibit a psychologist from producing tests or devices when ordered by a court subject to a protective order.[11]

As for federal law, defendants cite to the United States Supreme Court case of *Detroit Edison Co. v. NLRB* (1979) 440 U.S. 301 (*Detroit Edison*), asserting it stands for the proposition "that courts should prohibit the disclosure of confidential psychological

---

[11] We note that Standard 9.04 of the APA Ethical Standards, which according to Business and Professions Code section 2936 sets the standard of care for psychologists in California, allows for the release of "test data," which is defined as "raw and scaled scores, client/patient responses to test questions or stimuli, and psychologists' notes and recordings concerning client/patient statements and behavior during an examination," as well as "[t]hose portions of test materials that include client/patient responses," pursuant to a client/patient release. In the absence of a release, "psychologists provide test data only as required by law or *court order*." (Emphasis added.) Thus, the ethical standards arguably are not violated where, as here, a court orders release of test data.

While defendants assert AACN has taken the position that Standard 9.04 stems from a misunderstanding of "HIPAA" requirements, which do not require psychologists to release test data to a client or patient, this misunderstanding does not appear to extend to the statement in Standard 9.04 that allows psychologists to provide test data as required by law or court order.

Standard 9.11 addresses "test materials," which are defined as "manuals, instruments, protocols, and test questions or stimuli." Standard 9.11 provides: "Psychologists make reasonable efforts to maintain the integrity and security of test materials and other assessment techniques consistent with law and contractual obligations, and in a manner that permits adherence to this Ethics Code." This standard, however, does not require a psychologist to defy a court order for the purpose of guarding test materials.

testing material and raw psychological test data."  Defendants, however, overstate the holding of this case.

In *Detroit Edison*, the employer refused a union's request to disclose certain information about employee aptitude tests so the union could prepare for a grievance arbitration.  (*Detroit Edison*, *supra*, 440 U.S. at p. 303.)  The tests were kept in the offices of the employer's "industrial psychologists who, as members of the American Psychological Association, deemed themselves ethically bound not to disclose test information to unauthorized persons."  (*Id.* at pp. 306–307.)  The employer refused to disclose to the union the test questions, employee answer sheets, and the scores linked with the names of employees who received them, asserting it was necessary to maintain complete confidentiality of these materials to ensure the future integrity of the tests and to protect the examinees' privacy interests.  (*Id.* at pp. 303, 307–308.)  The National Labor Relations Board (board) ordered the employer to turn over all the materials directly to the union, subject to certain restrictions on the union's use of the information.  (*Id.* at pp. 303–304.)

The United States Supreme Court held the board abused its remedial discretion in ordering the employer to turn over the test battery and answer sheets directly to the union.  (*Detroit Edison*, *supra*, 440 U.S. at pp. 312–317.)  The Supreme Court noted the reasonableness of the employer's concern for test secrecy essentially had been conceded and the board had not cited any principle of national labor policy to warrant a remedy that would disserve this interest.  (*Id.* at p. 315.)  The Supreme Court found it obvious the remedy the board selected—"barring the Union from taking any action that might cause the tests to fall into the hands of employees who have taken or are likely to take them"— did not adequately protect test security, as the restriction was "only as effective as the sanctions available to enforce them."  (*Ibid.*)  The Supreme Court doubted whether the union would be subject to a contempt citation if it ignored the restrictions, as it was not a party to the enforcement proceedings in the Court of Appeals and board regulations

23.

contemplated a contempt sanction only against a respondent with contempt proceedings initiated only at the board's general counsel's discretion, and while in theory the board's general counsel could bring a separate unfair labor practice charge against the union, the general counsel could refuse to issue such a complaint. (*Id.* at pp. 315–316.) Moreover, the union "would not be accountable in either contempt or unfair labor practice proceedings" if there were inadvertent leaks. (*Id.* at p. 316.) Since the board did not identify any "justification for a remedy granting such scant protection to the [employer]'s undisputed and important interests in test secrecy," the board abused its discretion. (*Id.* at pp. 316–317.)[12]

Contrary to defendants' assertion, the Supreme Court did not hold that courts should prohibit disclosure of psychological testing materials or data. Rather, the Supreme Court, recognizing the importance of maintaining test security, found the protective order the board issued was insufficient to protect that security because it could not be enforced against the union if the union were to violate it.[13] In contrast here, the

---

[12] With respect to the test scores linked with the employees' names, the Supreme Court accepted for sake of discussion that the scores were potentially relevant to the union's grievance, as well as the board's position the ethical standards of a private group could not defeat the federal statutory duty to disclose relevant information. (*Detroit Edison*, *supra*, 440 U.S. at p. 317.) The Supreme Court was unable to sustain the board's conclusion the employer violated its obligation to bargain in good faith by resisting an unconsented-to disclosure of individual test results given (1) the sensitive nature of testing information, (2) the minimal burden compliance with the employer's offer to release the test results with the employee's consent, and (3) the absence of evidence the employer fabricated concern for employee confidentiality to frustrate the union's discharge of its responsibilities. (*Id.* at pp. 319–320.)

[13] The dissent in *Detroit Edison* believed the union would respect the confidentiality of the materials and take due precautions against inadvertent disclosure. (See *Detroit Edison*, *supra*, 440 U.S. at p. 323 (dis. opn. of White, J.) The dissent acknowledged the real concern was inadvertent disclosure, but it did not believe there was any "basis for assuming that the Union would handle the materials so cavalierly as to chance accidental disclosure, given the gravity with which the issue has been treated by all concerned." (*Detroit Edison*, at p. 324 (dis. opn. of White, J.).)

protective order can be enforced against plaintiffs' attorney if he or his staff were to violate it by contempt or other sanctions. (*Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 317.)**14**

Defendants assert a protective order is insufficient to protect test security because (1) the transfer of testing materials to plaintiffs' attorney is an ethical and professional violation even with a protective order; (2) protective orders do not erase knowledge an attorney may acquire concerning the test, which can be used to educate future clients about the test; and (3) the harm caused by a single violation of the protective order, whether intentional or inadvertent, outweighs the necessity of providing the testing materials to a non-psychologist.

On the first and second points, defendants cite to evidence that was not before the trial court when ruling on the motion for a mental examination. As we have explained, the only evidence before the trial court on the original motion was Dr. Victor's first declaration, which did not state that a protective order would not satisfy her ethical concerns. While Dr. Victor did state that dissemination of testing materials raises the risk that "motivated parties will coach and prepare examinees for testing in advance, specifically to influence the test results," that risk is not unique to psychological testing.

---

Defendants also cite *Brutsch v. City of Los Angeles* (1992) 3 Cal.App.4th 354 as an example of when a court upheld the security of testing materials. While that court recognized such an interest, the case did not involve disclosure of those materials pursuant to a protective order. (*Id.* at p. 359.)

**14** For example, "[u]nder California's general contempt law, '[d]isobedience of any lawful judgment, order, or process of court' is punishable as a civil contempt ([ ] § 1209, subd. (a)(5).) A civil contempt may be punished by a fine or imprisonment or both ([ ] § 1218) or, under appropriate circumstances, performance may be compelled by indefinite imprisonment ([ ] § 1219). 'Willful disobedience of any process or order lawfully issued by any court' also constitutes a criminal contempt, which is punishable as a misdemeanor. (Pen. Code, § 166, subd. (a)(4); see Pen. Code, § 19.)" (*City of Palo Alto v. Service Employees Intern. Union* (1999) 77 Cal.App.4th 327, 339.)

Moreover, defendants do not show testing integrity is meaningfully compromised by the potential for some attorney recall.

On the third point, as plaintiffs point out, technology makes transmission of highly sensitive information possible in many cases involving sensitive information, including personal injury, employment, business torts, and intellectual property. There is no evidence that attorneys regularly violate protective orders, including those concerning psychological or neuropsychological testing materials. Defendants have not shown there is a substantial risk of abusive intentional dissemination or an unacceptable risk of inadvertent disclosure such that the trial court was required to find a protective order would not adequately address Dr. Victor's concerns about test security.

Defendants also contend the protective order is overbroad because it requires disclosure to the jury during trial, which runs the risk of the jurors disclosing the information to anyone since they are not subject to the protective order. As plaintiffs point out, there may not be a jury trial and even if there is, any confidentiality concerns may be addressed at the time of trial, such as through defendants' right to object and seek further protections to limit the disclosure of test materials.

Defendants assert the trial court's transmission order deprives them from retaining another neuropsychological expert, which renders them powerless to fight against Buttram's traumatic brain injury claim. When the trial court issued the transmission order, however, it did not have before it any evidence defendants would be unable to retain another neuropsychologist should Dr. Victor recuse herself. Based on the record before it, the trial court reasonably could believe defendants would be able to retain a neuropsychologist who would comply with its order.

In sum, the trial court did not abuse its discretion in ordering transmission of raw data and audio recording to plaintiffs' attorney subject to a protective order, as plaintiffs

demonstrated a need for the materials and the protective order would address the concerns about test security and integrity.[15]

## III. *The Motion for Reconsideration*

Defendants assert the trial court abused its discretion when it denied their motion for reconsideration because they presented new facts and circumstances that required reconsideration of the transmission order. They further contend that given the limited time for bringing the motion for reconsideration, they presented "overwhelming evidence" the neuropsychological exam order had the practical effect of excluding their expert, thereby denying them a fair trial on the merits of Buttram's traumatic brain injury claim.

Section 1008 governs applications for reconsideration and renewed applications. (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 839; *Standard Microsystems Corp. v. Winbond Electronics Corp.* (2009) 179 Cal.App.4th 868, 885, disapproved on other grounds in *Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC*, *supra*, at p. 844.) Applications for reconsideration, which may be brought by any party affected by the order, are governed by section 1008, subdivision (a), which requires the motion to be (1) filed "within 10 days after service upon the party of written notice of entry of the order" of which reconsideration is sought, (2) supported by "new or different facts, circumstances, or law," and (3) accompanied by an affidavit stating the details of the first motion and "what

---

**15** On November 23, 2022, plaintiffs requested we take judicial notice of 26 unpublished federal district court cases and one published out-of-state court case, on which we deferred ruling. We deny the request for judicial notice. The unpublished federal district court decisions are not relevant to our disposition of the case and are not binding authority. (*People v. Zapien* (1993) 4 Cal.4th 929, 989.) Published decisions of other states are citable authority without the need for judicial notice.

new or different facts, circumstances, or law are claimed to be shown." (§ 1008, subd. (a).)[16]

Section 1008, subdivision (b) governs renewed applications or motions. It allows a party who originally applied "for an order which was refused in whole or part" to make a subsequent application for the same order based on "new or different facts, circumstances, or law." (§ 1008, subd. (b).)[17] A renewed motion requires the same affidavit as a motion for reconsideration but does not impose a time limit for bringing the motion. (*Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 768.)

"Courts have construed section 1008 to require a party filing an application for reconsideration or a renewed application to show diligence with a satisfactory explanation for not having presented the new or different information earlier." (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC*, *supra*, 61 Cal.4th at p. 839.)

"An order denying a motion for reconsideration is interpreted as a determination that the application does not meet the requirements of section 1008. If the requirements

---

**16** Section 1008, subdivision (a) provides: "When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown."

**17** Section 1008, subdivision (b) provides: "A party who originally made an application for an order which was refused in whole or part, or granted conditionally or on terms, may make a subsequent application for the same order upon new or different facts, circumstances, or law, in which case it shall be shown by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown. For a failure to comply with this subdivision, any order made on a subsequent application may be revoked or set aside on ex parte motion."

28.

have been met to the satisfaction of the court but the court is not persuaded the earlier ruling was erroneous, the proper course is to grant reconsideration and to reaffirm the earlier ruling." (*Corns v. Miller* (1986) 181 Cal.App.3d 195, 202.)

Defendants argue the trial court should have granted their motion for reconsideration based on new facts and circumstances, as they presented evidence Dr. Victor recused herself after reviewing the transmission order and they were unable to find a substitute neuropsychologist. Assuming defendants presented new facts and circumstances and provided a satisfactory explanation for failing to produce them earlier, we will not reverse on this procedural technicality.

It is clear from the transcript of the hearing that the trial court denied the reconsideration motion after examining the merits of the newly proferred evidence. In other words, the court's intent was to reaffirm the earlier ruling on the merits. To reverse and remand for the trial court to grant the reconsideration motion and then reaffirm its earlier ruling would be futile and a waste of judicial resources. (*Charles H. Duell, Inc., v. Metro–Goldwyn–Mayer Corp.* (1932) 128 Cal.App. 376, 385 ["it remains a rule of appellate procedure that a reviewing court will not remand a case where further proceedings therein would be futile"].)

We find no abuse of discretion in the trial court's de facto reaffirmance of its earlier ruling. In ruling on the motion, the trial court reviewed the AACN position paper on test security, which Dr. Victor referred to in her declaration in support of the motion for reconsideration. The AACN recognizes there are competing interests between the legal and psychological communities concerning the legal community's access to psychological and neuropsychological tests and test-related materials. The AACN acknowledges that "[a]s a last resort," psychological organizations and test publishers have recommended the use of protective orders to guard test security, but AACN had concerns about protective orders, as they may not be fully enforced, a single violation

29.

could result in widespread digital access of test materials by non-psychologists, and they do not erase newly acquired knowledge of tests from non-psychologists' minds.

The AACN notes as an alternative, or in addition, to protective orders "some practitioners may opt for other methods of maintaining test security, such as when faced with attorney demands for access to audio recordings of testing and test data sheets that show questions and answers, they proactively adjust test batteries and materials to protect tests," by only administering visual-type tests when audio recording of testing is allowed, or using reconfigured test data sheets that do not contain test stimuli, test instructions, or scoring algorithms when ordered to turn over test data sheets to opposing attorneys.

The AACN further advises: "When faced with a judicial order that a neuropsychologist believes undermines test security, the practitioner can choose to withdraw from the case, and can also opt to document, through canvassing of other local neuropsychologists, that the broader neuropsychology community refuses to conduct exams under invasive parameters that threaten the validity of the assessment process. This latter action may demonstrate to the court that the imposed conditions are not reasonable and not necessary."

It is this last guidance the trial court considered in ruling on the reconsideration motion. The trial court, however, believed the evidence defendants submitted—"two additional experts who refuse to do the exam under the court's existing order"—was "hardly a canvas." The trial court did not abuse its discretion in so finding. In support of the motion, defendants' attorney declared that after the transmission order was issued, she spoke to Dr. Boone, who stated she would not comply with the order, and with Dr. Holt, who stated no licensed neuropsychologist could comply with the order as written. Defendants' attorney further declared she "ceased canvassing licensed neuropsychologists at this point" because it appeared no additional value would be gained in attempting to find a neuropsychologist who would agree with the transmission order. The trial court reasonably could find evidence in the form of conversations with two

30.

neuropsychologists was insufficient to establish, as stated in the AACN position paper, that the "broader neuropsychology community refuses to conduct exams under invasive parameters that threaten the validity of the assessment process."

Defendants assert the trial court ignored the declarations of Drs. Lulow and Friedman that defendants provided with their reply brief. While Drs. Lulow and Friedman stated they complied with orders in prior cases requiring the disclosure of testing materials to a party's attorney because courts ordered them to do so, and they objected and "continue to object to the forced violation of [their] ethical and legal duties" as neuropsychologists, neither doctor explicitly stated they would refuse to conduct an examination under the parameters set forth in the transmission order if ordered by a court. They also did not state that the broader neuropsychological community refuses to conduct exams under those parameters.

Defendants argue because section 1008, subdivision (a), required a motion for reconsideration to be filed within 10 days after service of notice of entry of the mental examination order, the trial court acted unreasonably by requiring them to obtain a comprehensive canvas of neuropsychologists. Defendants assert it was unreasonable to expect them to obtain such a canvas in 10 days and to discount Dr. Victor's recusal and the opinions of the four neuropsychologists because defendants did not speak to more neuropsychologists.

Defendants fault the trial court for relying on the standards that defendants' own experts relied on. The trial court, however, cannot be faulted for expecting defendants to present more than a handful of neuropsychologists before it would modify the transmission order. While defendants claim their time to collect evidence was limited, they never asked for a continuance of the hearing so they could do so.

Moreover, the time-frame argument is a red herring, as defendants had, and still have, the ability to bring a renewed motion under section 1008, subdivision (b), for the trial court to grant the relief they requested in their motion for a mental examination,

31.

namely, an order requiring transmission of the testing materials, raw data, and audio recording only to a licensed psychologist or neuropsychologist. (See, e.g., *California Correctional Peace Officers Assn. v. Virga* (2010) 181 Cal.App.4th 30, 43 [where two motions for attorney fees sought "identical relief," the second motion was a motion for "the same order" under section 1008, subdivision (b)].)[18] That motion has no time limit.

In sum, there is no apparent abuse of discretion in denying the motion for reconsideration.

**IV.**    *Conclusion*

Defendants fail to establish that the trial court was required to (1) order the raw data and audio recording be transmitted only to a licensed psychologist or neuropsychologist, or (2) grant reconsideration and modify the transmission order to so provide. Consequently, "they have not demonstrated in this writ proceeding that the superior court was under a legal duty to order, or that its discretion could be legally exercised only by ordering," transmission only to a licensed psychologist or neuropsychologist. (*Roe*, *supra*, 243 Cal.App.4th at p. 149, citing § 1085, subd. (a) & *Babb v. Superior Court* (1971) 3 Cal.3d 841, 851.)

Moreover, defendants have not demonstrated there is no "plain, speedy, and adequate remedy, in the ordinary course of law" available to them. (§ 1086.) Defendants "bear the burden of showing that they lack such a remedy." (*Roe*, *supra*, 243 Cal.App.4th at p. 149.) Defendants complain they have no recourse and without our intervention they will have to proceed without an expert. We recognize defendants' interest in having a neuropsychologist assess Buttram's traumatic brain injury claim, and that "a court must act with great care before entering an order which as a practical matter excludes a designated expert from testifying." (*Stony Brook I Homeowners Ass'n v.*

---

**18**     In addition, the trial court retains "authority to control discovery, including its right to issue, modify, or vacate protective orders." (*Mercury Interactive Corp. v. Klein* (2007) 158 Cal.App.4th 60, 106.)

*Superior Court* (2000) 84 Cal.App.4th 691, 700.) But the trial court has not foreclosed future relief should defendants be unable to locate a neuropsychologist that will comply with the transmission order, as defendants can renew their motion for expert-to-expert transmission under section 1008, subdivision (b).

Defendants assert additional canvassing of neuropsychologists would be futile, as shown by the amicus curiae briefs, documents filed in a case pending in Los Angeles Superior Court,[19] and the declaration of two neuropsychologists filed with defendants' reply brief. The larger point here, however, is that the trial court was never presented with this evidence. For example, while AACN states in its brief that a neuropsychologist cannot participate if disclosure of testing information is compelled by the court, this statement appears inconsistent with its position paper, which provides suggestions on how a neuropsychologist can comply with court-ordered disclosure to non-neuropsychologists.[20] The propositions from the documents filed in the Los Angeles

---

[19] The propositions from the documents submitted in a different case pending in Los Angeles Superior Court, *Ellensohn v. HHS Construction, Inc.* (Super. Ct. L.A. County, No. BC648515), are not properly before us. These documents include 22 declarations from neuropsychologists stating they could not comply with an order that is like the transmission order. Since defendants are offering the documents for the truth of the statements made therein, we deny defendants' January 4, 2023, request to take judicial notice of the documents. "It is well settled that a court cannot take judicial notice of the truth of matters stated in pleadings or affidavits in the court file of another case, although it can be noticed that the documents *exist*. Judicial notice can be taken only of the contents of orders, findings of fact, conclusions of law, and judgments." (*Bennett v. Regents of University of California* (2005) 133 Cal.App.4th 347, 358, fn. 7, citing *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1564.)

[20] To the extent the test publishers, Manson Western and PAR, object to the transmission order on copyright or trade secret grounds, those issues were not raised by defendants or considered by the trial court. We generally do not consider arguments raised by amici curiae that are not presented in the trial court or urged by the parties on appeal. (*Mercury Casualty Co. v. Hertz Corp.* (1997) 59 Cal.App.4th 414, 425; *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1274–1275.)

33.

Superior Court case are not properly before us, and we decline to consider the dual declaration of Drs. George K. Henry and David Lechuga, as the declaration presents evidence that was not before the trial court.[21]

Accordingly, no writ relief is warranted concerning either the motion to compel the mental examination or the motion for reconsideration.

Defendants and amici curiae urge us to create a bright-line rule limiting transmission of neuropsychological and psychological testing materials and raw test data, as well as audio recordings of examinations, to licensed neuropsychologists or psychologists. They contend without a rule requiring expert-to-expert transmission of these materials, the integrity and security of neuropsychological and psychological tests will be compromised. The Legislature, however, has not codified the expert-to-expert limitation advocated by defendants and amici curiae. On this writ, our role is simply to determine whether, based on the rules of evidence, the trial court abused its discretion in

---

[21] We recognize that on an original petition for mandamus relief, a reviewing court has discretion to consider evidence that was not before the trial court. (*Bruce v. Gregory* (1967) 65 Cal.2d 666, 670–671; *McCarthy v. Superior Court* (1987) 191 Cal.App.3d 1023, 1030, fn. 3.) However, a reviewing court ordinarily " 'will not consider evidence arising after the trial court ruling, involving facts open to controversy which were not placed in issue or resolved by the trial court.' " (*Rodriguez v. Superior Court* (2021) 70 Cal.App.5th 628, 642–643, review granted Jan. 5, 2022, S272129; see *People v. Superior Court* (*Lavi*) (1993) 4 Cal.4th 1164, 1173, fn. 5; *Stevens v. Superior Court* (1999) 75 Cal.App.4th 594, 607, fn. 13.) While we grant defendants' January 3, 2023 request to file a supplemental appendix of exhibits comprised of the minute order from the August 9, 2022 hearing on defendants' motion for reconsideration and the dual declaration of Drs. Henry and Lechuga, we decline to consider the declaration.

Plaintiffs filed an appendix of exhibits with their return, comprised of declarations by plaintiffs' attorneys Mark Nagle and David Shay. Attached to Nagle's declaration is a document purporting to be a survey of federal and out-of-state cases regarding balancing expert discovery rules and psychologists' ethical and contractual duties, while Shay's declaration contains opinion and evidence not presented to the trial court. Defendants filed a motion to strike the declarations and attached exhibits on numerous evidentiary grounds. As these declarations were not submitted to the trial court and are irrelevant to our analysis, we grant defendants' motion to strike filed on December 30, 2022.

ordering transmission of these materials to plaintiffs' attorney subject to a protective order. We recognize there are concerns that a protective order is insufficient to protect test security and that no neuropsychological or psychological expert will comply with such an order. These concerns, however, are better expressed to the Legislature, which is empowered to create evidentiary rules limiting the transmission of discovery materials.

## DISPOSITION

The order to show cause is discharged and the petition for writ of mandate is denied. The stay of proceedings in the trial court is dissolved upon finality of this decision in this court. Real parties in interest are entitled to recover their costs in this writ proceeding.


                                                DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


PEÑA, J.

35.

Filed 5/18/23

<u>**CERTIFIED FOR PUBLICATION**</u>

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| RANDY'S TRUCKING, INC., et al.,<br><br>Petitioners,<br><br>v.<br><br>THE SUPERIOR COURT OF KERN COUNTY,<br><br>Respondent;<br><br>ANGELA BUTTRAM et al.,<br><br>Real Parties in Interest. | F084849<br><br>(Super. Ct. No. BCV-20-100982)<br><br>**ORDER GRANTING REQUEST FOR PUBLICATION** |

As the nonpublished opinion filed April 26, 2023, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

DE SANTOS, J.

WE CONCUR:

POOCHIGIAN, Acting P. J.

PEÑA, J.